DONIGAN *v.* DONIGAN
(Two Appeals in One Record)

[No. 36, October Term, 1955.]

512

514

*Decided January 6, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*J. B. Randol Carroll* and *Charles B. Levering* for the wife.

*John Henry Lewin,* with whom were *David C. Green* and *Venable, Baetjer & Howard* on the brief, for the husband.

HAMMOND, J., delivered the opinion of the Court.

Before us in this case are cross-appeals. The wife, who was granted an absolute divorce, appeals from the action of the chancellor in (1) denying alimony, (2) refusing to retain jurisdiction so as to permit the award of alimony in the future, (3) refusing to require the husband to give security for the payment of the allowance made for the child of the couple, and for the alimony sought, and, finally, in refusing allowance in full of expenses incurred in the preparation of her case and adequate counsel fee to her solicitors. The husband urges that the decree be affirmed but challenges in his appeal the allowance made by another chancellor of counsel fees for services in this appeal.

The parties were married in 1943. She was an army nurse and he was in the army. A daughter was born two years later. After his release from the army the couple settled in Baltimore at the urging of the wife and the husband's brother, who persuaded him that his habit of carefree travel from one part of the country to another, visiting with relatives and friends, should cease, and that he should get down to work. He is a college graduate but the only remunerative effort he has ever made, except to serve in the army, was his work in Baltimore as an expeditor for a moving and storage company for about a year. He earned some $3,000.00 during this period. In 1948 he went back in the army and thereafter was assigned to duty in Japan. Some six months later, the wife and child joined him and soon found that

they were unwelcome by reason of the husband's infatuation with a girl serving with the Red Cross. Finally, because of his continued neglect and refusal to live with her, if not downright antagonism towards her, the wife complained to his superior officers. Soon afterwards, he left the house in which they made their home with his clothes and personal effects and would not give her money on which to live. Subsequently, as a result of the intercession of other officers, he gave her $1,000.00 to use while she was awaiting transportation to the United States and for support upon her return. Thereafter, the husband gave her no money for some time, so that she was compelled to resume her occupation as a nurse in a veterans hospital in Topeka, Kansas. Later, through the efforts of a lawyer, her husband, who had returned to this country, was induced to send her $150.00 a month, which he subsequently reduced to $100.00 a month. In April, 1951, the wife, to obtain support and maintenance for herself and the daughter, who was then six years of age, filed proceedings in Minnesota to reach the royalties her husband was receiving from the lessee of an iron ore mine in which he owns 1/108th interest. After the highest court of Minnesota had affirmed the jurisdiction of courts of that State to award support and maintenance from property in the State, where both parties were non-residents, the lower court, in April, 1953, awarded the wife $175.00 a month for herself and the child and ordered an additional sum of $300.00 a year to be paid for the education of the child. The court took care to point out that the allowance was based solely upon the husband's property interests in Minnesota. Neither the husband nor the wife appealed from this judgment.

In March, 1952, the husband filed a bill of complaint for an absolute divorce in the Circuit Court of Baltimore City, charging the wife with abandonment. After the decision in her favor in the Minnesota proceedings, and after full investigation had satisfied her that her husband was domiciled in Maryland, the wife, in September,

1953, countered with her cross-bill of complaint, in which she sought an absolute divorce on the ground of constructive desertion, as well as permanent alimony, custody of and support for the child, and costs and counsel fees. The husband answered the cross-bill and indicated that he would fight the relief sought. However, several days before the case was scheduled to come on for hearing in open court in 1953, he made it known to the court and opposing counsel that he did not intend to press his bill of complaint or offer any evidence in the case, but that he did intend to oppose the cross-bill. The morning before this scheduled hearing, the court was notified that the husband would not contest the wife's right to a divorce but would oppose the allowance of alimony, expenses and counsel fees. In a conference in the chancellor's chambers, it was agreed that all of the testimony in the case would be taken before an examiner and would be referred to a master to determine whether the evidence entitled the wife to the absolute divorce which she prayed, but that the allowances for alimony, support, counsel fees and expenses would be ruled upon by the judge without first being submitted to the master. In due course the master reported that the wife was entitled to an absolute divorce and the chancellor then examined the papers in the case and the testimony and considered the memoranda in support of the contentions of the parties, but did not hear oral argument. He reached his decision on the basis of the record and the memoranda alone.

The testimony produced on behalf of the wife established to the satisfaction of the master and the chancellor that the husband made the wife's life in Japan so unbearable and degrading as to make it impossible for her to live there without loss of health and self-respect, and that she had no alternative but to return to the United States. The husband does not here challenge the action of the court in granting the divorce. The parties agree that the effect of the divorce in Maryland would be to terminate the allowances for maintenance and support

made by the Minnesota court, and the chancellor acted on that assumption.

It is stipulated that the chancellor stated in substance: "that he would not make any allowance of alimony as he found that she was employed and self-supporting; that he would not retain jurisdiction for future alimony and support; that he would allow $130.00 per month for the support of the infant child of the parties, subject to the further order of the Court; that he would allow Mrs. Donigan a counsel fee of $1,000.00" and that he would allow expenses incurred by the wife in the amount of $522.50 out of a total claimed of $1,268.38.

We turn then to whether the wife's claim that she is entitled to alimony is justified. The husband says that the case is controlled by Code, 1951, Art. 16, Sec. 17, which provides: "In all cases where alimony or alimony *pendente lite* and counsel fees are claimed, the court shall not award such allowances or counsel fees unless it shall appear from the evidence that the wife's income is insufficient to care for her needs", and that the discretion of the chancellor determines whether alimony is to be awarded, and if so, the amount. He urges that unless it can be· shown that the chancellor's discretion was "arbitrarily used" or his judgment "clearly wrong", citing *Lopez v. Lopez,* 206 Md. 509, 521, this Court may not change the decision as to alimony. The argument continues that once the chancellor had determined that the wife's income, by virtue of her work as a nurse, was sufficient for her needs, there was no power to grant alimony and that the Court of Appeals is bound by that finding unless it is demonstrated to be wrong.

The husband, although he does not work and lives entirely on the royalties from his interest in the mine, says that: "There is not the slightest indication in the language of the statute or in the decided cases that the General Assembly intended to exonerate all divorced women from the responsibility of doing what they can to support themselves." We think that the evidence does not support the premises on which the husband's

argument is based and that his conclusions are unsound. The terms and effect of the statute are not rigid and unyielding but, rather, are relative and flexible. What is insufficient for A under one set of circumstances may be sufficient for B under another set of circumstances. What might be luxury for one woman could be poverty for another. This has been set forth repeatedly in the cases. In *Waters v. Waters,* 191 Md. 436, 440-1, the Court said: "In determining an award of alimony and whether 'the wife's income is insufficient to care for her needs', the court should consider the husband's wealth and earning capacity, the station in life of the parties, age, physical condition, the ability to work, the length of time the parties have lived together, the circumstances leading up to the divorce, and the fault which destroyed the home. *Timanus v. Timanus,* 178 Md. 640, 642, 643, 16 A. 2d 918; *Dougherty v. Dougherty,* 187 Md. 21, 48 A. 2d 451, 457; *Bradshaw v. Bradshaw,* 189 Md. 322, 326, 55 A. 2d 719, 721. Also, of course, to be taken into consideration are the assets and income of the wife. *Hood v. Hood, supra,* 138 Md. page 360, 113 A. 895, 15 A. L. R. 774. In making such an award the court can only use judicial discretion. Of course, there is no special statute or rule governing this discretion. It must be exercised to the necessary end of awarding justice and based upon reason and law." See, too, *Danziger v. Danziger,* 208 Md. 469, 474. In refusing to grant alimony, the chancellor overlooked these facts: the Minnesota court found the needs of the wife and child to require an award of $200.00 a month; the wife showed—and there was no challenge to the reasonableness or the necessity for the expenditures—that she had to meet the following monthly expenses: rental value of the home, $70.00; utilities, $30.00; groceries, $100.00; medical expenses, $12.60 (keeping up Blue Cross and Blue Shield along with medications that have to be bought, including dental expenses) ; transportation for schools and taxis, $6.00; school tuition, laundry, dry cleaning and the expense on the upkeep of uniforms and school clothes,

$27.50; clothing expense, $75.00 (which includes the repairs and alterations and also costumes for Paula's dancing) ; dancing tuition, $5.00; furniture upkeep, replacement of linens and so forth, $10.00; a cleaning woman, $20.00; miscellaneous expenses, $50.00; $6.00 on the yard upkeep (there are five months out of the year when that runs a little more) ; $10.00 for hairdressers; $30.00 for a woman who looks after Paula (a baby sitter) ; $6.00 for church and charity donations; the total is $458.10 a month, and the rent the wife pays is $30.00 a month less than it would be if she did not lease her home from her brother.  The $248.00 she has available after taxes, together with $130.00 a month allowed her by the court, totals $378.00, approximately $80.00 a month less than her needs.  The station in life and the standards of the parties make these needs reasonable.  At the time of the separation the husband received $5,500.00 a year as an officer of the army and had income from the mine royalties of about $5,000.00, or a total of $10,500.00 a year. If it be assumed that in civilian life he could earn the $3,000.00 a year he once did earn, his present income would be approximately the same as it was when they separated, since his royalties now are about $8,000.00 a year.  The husband is about forty years of age but prefers to travel about the country rather than work, or as his wife puts it, he enjoys play more than he does work. As the cases have stated, the income of the wife must be considered and this means earned income as well as income from invested capital or other sources, but certainly, if the wife's income is insufficient for her needs, the husband's obligation is not less because he would rather be idle than industrious and peripatetic than productive, although he has the mental and physical ability to earn a living.  The record shows that the royalties from the mine have increased steadily, year by year, from $3,500.00 in 1948 to $7,800.00 in 1953, and it is agreed that they are now running at the rate of $8,000.00 a year.  There was testimony that the husband's interest

in the mine was worth $40,000.00 and that it would be fully productive for some seventeen years.

We think the chancellor was clearly wrong in refusing alimony. The award of alimony generally is a question of judgment on facts not in dispute and it is peculiarly the kind of determination which an appellate court feels freer to make than it does in matters which depend upon credibility, where the appearance and demeanor of the witnesses are important and the determination of disputed facts controls the case. Undoubtedly, this is the reason why this Court sometimes has changed the award of alimony, without expressly saying (as necessarily was implicit in the decision) that the chancellor was clearly wrong. In the case before us the chancellor did not see the witnesses and decided the case from the record, even as do we, without the benefit of oral argument which we have enjoyed, so that his opportunity for a sound exercise of judgment was not as great as ours. We think that the allowance made by the Minnesota court was proper and should be continued; that is, that the husband should be ordered to pay for the support and maintenance of the wife and child, the sum of $200.00 a month. It would be well to specify how much is alimony for the wife and how much support for the child, *Hull v. Hull,* 201 Md. 225, 234, although this is not essential. *Cullotta v. Cullotta,* 193 Md. 374, 385. If the husband's income, from mine royalties or otherwise, increases or decreases, or if the wife is unable to work or there are other changes of circumstances, that fact may be reflected in future orders of the equity court which will have jurisdiction to act. *Lopez v. Lopez, supra; Hull v. Hull, supra.*

We think, too, that the wife is entitled to have the husband give security for the payment of the alimony and maintenance ordered by the court. His disposition not to pay at all, or as little as possible, is made manifest by the record. He has shown a definite, and seemingly lasting, tendency to travel about the country. Indeed, at the argument of the case, his counsel was unable or unwilling to disclose his whereabouts to the court. Al-

522

ready, the wife, a resident of Kansas, has been forced to go to Minnesota and to Maryland to secure support. He has no Maryland property or income. She asks that the appellee be required to give a bond or to assign sufficient of his royalty income to meet the payments to be decreed. A bond would subject the husband to additional expense. We think the chancellor should decree that he assign to the wife or a suitable trustee for her and the child so much of his interest in the royalties as is necessary to produce the alimony and support ordered, and enjoin him from otherwise disposing of or encumbering such interest. There would seem to be no doubt that the court has the power to pass such a decree. It is generally held that, by virtue of its power over a person properly before it, a court of equity may compel him to act in relation to property not within the jurisdiction, as it could in relation to property within the jurisdiction, but that its decrees do not operate directly on the property nor affect the title, but are only made effectual by directing some action on his part, such as the execution of conveyances or the execution or cancellation of other instruments or writings. *Pomeroy's Equity Jurisprudence*, 5th Ed., Sec. 1318; 30 C. J. S., *Equity*, Sec. 81; *Sun Cab Co. v. Cloud*, 162 Md. 419, 429; *Keyser v. Rice*, 47 Md. 203, 213; *Longley v. McGeoch*, 115 Md. 182, 187. In *Fall v. Eastin*, 215 U. S. 1, 54 L. Ed. 65, 69, the court referred to language of *French v. Hay (French v. Stewart)*, 22 Wallace 250-2, 22 L. Ed. 857, 858, that a court of equity, having jurisdiction *in personam*, has power to require a defendant "* * * 'to do or to refrain from doing anything beyond the limits of its territorial jurisdiction which it might have required to be done or omitted within the limits of such territory'." See too *Watkins v. Holman*, 16 Peters 25, 57, 10 L. Ed. 873, 886; *Burnley v. Stevenson*, 24 Ohio St. Rep. 474. *Beale, The Conflict of Laws*, Vol. 2, Sec. 449.1, agrees. The rule has been recognized in divorce cases. *Taylor v. Taylor*, Sup. Ct. of Calif., 218 P. 756; *Mattson v. Mattson* (Iowa), 173 N. W. 127, 131; *Mallette v. Scheerer* (Wisc.), 160 N. W. 182; *Bullock v. Bullock* (N. J.), 30 A. 676-7. The circuit

court, having jurisdiction *in personam* over the husband, could, if the iron mine were in Maryland or the payor of the royalties in Maryland, place a lien on the mine and enjoin him from alienating his property—that is, his rights to payments of royalties as they accrue—and require him to assign so much therefrom as would be required to meet the amounts ordered by the court. The court could enforce its order under the provisions of Code, 1951, Art. 16, Sec. 222, by means of contempt, sequestration, execution and attachment. *Oles Envelope Corp. v. Oles,* 193 Md. 79, 91-4. See also *Zouck v. Zouck,* 204 Md. 285, 301; and *Ricketts v. Ricketts,* 4 Gill 105.

In the case before us the orders of the court, affirmative and negative, may be enforced by contempt proceedings. If the husband executes the assignment, it is generally held that its validity would be recognized elsewhere even though the execution had been coerced. If he refuses to execute the assignment, the Maryland decree may or may not be enforced in Minnesota, as the authorities above reveal. Cf. *Bullock v. Bullock* and *Fall v. Eastin,* which denied enforcement, with *Mattson v. Mattson* and *Mallette v. Scheerer,* which granted it (all *supra*). See, too, *Restatement, Conflict of Laws,* Sec. 447; and *Beale,* reference given above. It would seem to depend on the policy and procedures of the other State, and there is an increasing tendency to enforce. *Restatement, Conflict of Laws,* 1948 Supp., sec. 464. There is some indication Minnesota would do so. *Ladd v. Martineau* (Minn.), 285 N. W. 281, 284; *Donigan v. Donigan* (Minn.), 53 N. W. 2d 635.

The wife asked to be reimbursed in the approximate sum of $1,200.00 which she had spent in preparation for the Maryland proceedings. The chancellor allowed $500.00 and disallowed $700.00. As to $300.00—the cost of depositions which might have been used both in Minnesota and Maryland, the parties disagree. The wife says the Minnesota court did not allow these expenses and the husband says it did. We cannot tell from the record who is right, in whole or in part, and therefore we shall affirm the chancellor on this point. We think,

however, that the $411.62 spent by the Baltimore solicitors for travel, communication and investigation in connection with the Maryland hearings, was reasonably necessary and of the kind the husband is required to pay. *Gosnell v. Gosnell,* 208 Md. 179, 182-183.

The Kansas counsel for the wife, and her Baltimore counsel each requested a fee of $2,500.00. The court allowed a total fee of $1,000.00. Undoubtedly, because of the need for action in places far apart and the question of jurisdiction, the case has demanded unusual time and effort on the part of counsel over a period of several years. Yet, in divorce cases, what might have been earned, and payable if the resources of the husband permitted it, often must be cut down because its payment would be unreasonable in relation to the means to pay. *Waters v. Waters, supra.* The record does not show that the husband has available resources other than his right to royalties and some $5,000.00, which is his half share in a division of property of the parties. He has been required to make substantial outlays in expenses and fees in the Minnesota proceeding and, as we have noted, will be required to pay some $1,000.00 in expenses in this case. Under the circumstances, we think that although the wife's solicitors may well have earned more, an additional fee of $500.00 is all that can be justified, and that the decree should order this additional amount to be paid, making total counsel fees of $1500.00.

We find the action of the chancellor in allowing a counsel fee of $250.00 for the prosecution of the appeal in this Court, was entirely justified. *Dougherty v. Dougherty,* 187 Md. 21; *Gosnell v. Gosnell, supra.*

> *Decree as to counsel fee on appeal affirmed. Decree as to divorce, custody, alimony, and allowance affirmed in part and reversed in part and case remanded for passage of a decree in conformity with the views herein expressed, the appellee to pay the costs.*