RUBIN *v.* RUBIN

(Two Appeals in One Record)

[No. 70, September Term, 1963.]

120

*Decided December 6, 1963.*

The cause was argued before HENDERSON, HAMMOND, HORNEY, MARBURY and SYBERT, JJ.

*Wallace Dann* and *Calvert Ross Bregel,* with whom was *Howard Calvert Bregel* on the brief, for the appellant and cross-appellee.

*Herbert Myerberg* for the appellee and cross-appellant.

HORNEY, J., delivered the opinion of the Court.

The cross-appeals in this action for permanent alimony and support of a minor, by Rose Rubin, the wife, against Morris Rubin, the husband, based on the ground of adultery, present three questions: (i) as to whether the amount of alimony and support awarded was excessive; (ii) as to whether the chancellor erred in ordering the husband to pay the charges of an investigator employed by the wife; and (iii) whether the chancellor erred in declining to cite the husband for contempt for refusing to pay the investigator's charges.

The parties were married in December of 1931. Two sons and a daughter were born as a result of the marriage. The sons are now adults and married. Custody of the daughter, who is now eighteen years of age and a college student, was awarded to the mother.

Although the husband appealed generally from the decree, he does not challenge the cause for nor the award of alimony and custody of and support for the daughter, but he does contest the amount of the award of alimony and support and the allowance to the wife of the expense of an investigator. The facts therefore may be limited to such of the testimony as relates to the financial worth of the husband, his income and earning capacity and to the employment by the wife of a detective to investigate and acquire information of the husband's adulteries to support the allegations in the bill of complaint.

The husband and a brother operate a restaurant and bar. Prior to November of 1961, the business was run as a partnership. Since that date it has been operated by a corporation in which each of the former partners own fifty per cent of the capital stock. The net profits for the eleven months of the fiscal period from November 1, 1961, to September 30, 1962, were $22,916, exclusive of officers' salaries. The net profits for the calendar year of 1960 had been $16,692. For ten months of the calendar year 1961, the net profits had been $14,630. At the end of September 1962, the corporation, after allowing for depreciation, officers' salaries and other expenditures, showed a net profit of $11,416, before the payment of income taxes. After the payment of taxes, the net income of the corporation was $7858. An analysis of the 1962 balance sheet reveals total liquid assets of $18,302.24 and total liabilities of $83,699.92, including the mortgage of $36,600 on the building owned by the corporation and the "family" loans of $25,818. But there was testimony by the partner-brother that, except for the "family creditors," their debts totaled only $3672.50, were "not too high" and could be paid off without any substantial "change or effect" on the business.

During the operation of the partnership, each of the partners drew $125 per week, and the income taxes due by each was charged to his capital account, so that the weekly drawings of

$125 were net. But, after the formation of the corporation, this was no longer possible, and the gross weekly salary of the husband of $125 was reduced to approximately $97.50 as "take home" pay. There were, however, certain, "fringe benefits," such as the use of an automobile owned by the corporation at no expense to the husband, and such food and drink as he chose to consume at the restaurant and bar. There was also evidence that on vacation the husband charged his meals to the corporation by means of a credit card. He testified that he had "no personal living expenses," but there was evidence that he incurred substantial bills for personal clothing.

The home of the parties was owned by the husband and wife as tenants by the entireties. At the time of trial it was encumbered by a first mortgage balance of $1883.40 and a second mortgage, placed thereon by the husband when he and his brother began operating the business, on which the balance due was $2746.16. There was no testimony as to the value of the property. The wife, it seems, assumed the monthly payments aggregating approximately $145 on both mortgages. She and the daughter presently occupy the home. Apparently the husband resides elsewhere. The wife, who was not working at the time of trial, estimated that the total living expenses of herself and daughter, exclusive of income taxes, was in excess of $180 per month.

On these facts, and the voluminous other testimony and exhibits in the record, the chancellor estimated that the average income of the husband was slightly in excess of $250 per week. Prior to the decree the weekly payments for alimony *pendente lite* and household expenses had been $100. By the decree, the chancellor awarded permanent alimony and support for the daughter of $148 per week, which, pursuant to the decree, has since been increased to $171 per week.

Before the marital difficulties between the parties began, the husband came home regularly between 2:30 and 2:45 a.m. after he had finished work at the restaurant and bar. After their difficulties began, the husband would not come home until daybreak. When the wife asked him the reason for being late, his explanations caused her to suspect that he was unfaithful to her. Prior to employing the investigator, the wife, either alone

or with a sister-in-law, had seen her husband and one of his mistresses together on several occasions after the restaurant and bar closed. On one occasion in November of 1959, the wife saw her husband's automobile parked near the apartment of the mistress and watched for half an hour, but saw nothing. On another occasion in early December of 1959, she saw her husband purchase food at a nearby restaurant and watched as he and the mistress went to her apartment together at about 2:30 a.m. When asked about these occurrences, the husband denied them, and everytime the wife questioned him about not coming home earlier, he would become belligerent and make their living together even more difficult for her. This, she testified, was the reason she decided to employ an investigator.

Later in December of 1959, the wife, the investigator and other witnesses observed the husband and his mistress at her apartment under such circumstances as indicated that the husband was guilty of adultery. Suit was not filed until June 3, 1960. Thereafter, in August of 1960, the wife, the investigator and other witnesses observed the conduct of the husband with another mistress in such state of undress as to warrant an inference of the commission of adultery. The investigator charged $455 for the investigation services, of which the wife paid $255 on account, leaving a balance of $200 unpaid at the time of trial. The chancellor, in addition to decreeing payment of a counsel fee and the court costs, directed the husband to reimburse the wife to the extent of $255 and to pay the balance of $200 due the investigator, but declined to cite the husband for contempt when he refused to pay such sums.

(i)

The award of alimony to the wife and support for the daughter was excessive. The weekly gross salary of the husband was $125 per week. On the theory that the husband was entitled to one-half of the net profits of the corporation for 1962 as income, and that such "income," plus the "fringe benefits" he otherwise received from the business, amounted to another $125 per week, the chancellor found that the husband had a total gross weekly income of $250. Although the chancellor considered the "net profits" of the corporation instead of its "net in-

come" after taxes,[1] we cannot say, since there was some evidence that the debts of the corporation were negligible, that the chancellor was clearly wrong in finding that the husband's share of net profits or income of this "close" corporation, plus the so-called "fringe benefits" he had received, was the equivalent of $125 per week. Even so, the award of $171 per week out of total income of $250 was too much. We think that $120 per week would be a more reasonable amount to allow. This, of course, may be increased or decreased from time to time as circumstances may require.

### (ii) and (iii)

The contention that the chancellor erred in ordering the husband to pay the charges of the investigator employed by the wife to gather evidence of the husband's adulteries, insofar as it is based on the fact that there is no statute in this state requiring a husband to pay such charges, is not sound. While permanent alimony can only be granted to a wife on a showing of facts sufficient to support a decree of divorce, *Levy v. Levy,* 229 Md. 103, 181 A. 2d 663 (1962), it would seem to follow that if the chancellor has authority in an action for divorce to award the charges of an investigator as suit money, he can allow such expenses in an action for permanent alimony. Courts of equity were given jurisdiction to hear and determine "all causes for alimony" by Chapter 12, § 14, of the Laws of 1777. See Code (1957), Art. 16, § 2. It is also true that the jurisdiction of equity over divorce actions was created, and the power of such courts to award alimony where a divorce is decreed was authorized, by Chapter 262, §§ 1, 3, of the Laws of 1841: prior thereto divorces were granted by the Legislature. See Art. 16, §§ 3, 22. But that does not mean that courts of equity are without power to allow suit money, including investigation expenses, in a proper case for services rendered by

---

1. The net profits of the corporation were $11,416 before deduction of taxes. After taxes, the "net income" of the corporation was approximately $7850. The chancellor, however, found that the "net profits" of the business (after adding thereto certain previously allowed deductions) were $12,041 and that the husband was entitled to one-half of this amount as his share.

an investigator. It was said in *McCurley v. McCurley,* 60 Md. 185, 188 (1883), quoting 2 Bishop, *Marriage, Divorce and Separation,* § 387, that the nature of the wife's allowance for the expenses of a divorce suit is " 'in fact a sort of alimony; the one being for the defraying the ordinary expenses of the wife in the matter of living; the other being for the same purpose in respect to the matter of the suit.' " It is clear that the authority of the chancellor to include the charges of an investigator in the allowance of suit money is not derived from nor limited by statute, but must be found in the adjudicated cases.

It is settled law in this state that in a divorce action the wife, when she is without independent means of her own, has the right to require her husband to defray the expenses incurred by her in the suit. *Coles v. Coles,* 2 Md. Ch. 341 (1851) ; *McCurley v. McCurley,* (60 Md. at 189) ; *Daiger v. Daiger,* 154 Md. 501, 140 Atl. 717 (1928) ; *Gosnell v. Gosnell,* 208 Md. 179, 182, 117 A. 2d 861 (1955). Accordingly, when it is shown that the wife does not have sufficient money, this Court has consistently held that the husband is required to pay reasonable counsel fees for services rendered her in a divorce suit —see, among other cases, *Smith v. Smith,* 216 Md. 141, 140 A. 2d 58 (1958), and *McCurley v. Stockbridge,* 62 Md. 422 (1884)—and in *Donigan v. Donigan,* 208 Md. 511, 524, 119 A. 2d 430 (1956), it was held that money spent by the wife's solicitors "for travel, communication and investigation" in connection with her suit for divorce "was reasonably necessary and of the kind the husband is required to pay."

The reasonable and necessary expenses or "suit money" to which a wife is entitled, is generally defined as the money necessary to enable her to carry on or defend a matrimonial action, that is, the necessary expenses relating to bringing and carrying on or defending the action. See 1 *Nelson on Divorce and Annulment* (2nd ed.), § 12.04; *Keezer on the Law of Marriage and Divorce* (3rd ed.), § 601. It has been held or said that suit money cannot be allowed for expenses incurred and for legal services rendered before suit was instituted since such are previously incurred expenditures and do not constitute expenses necessary for carrying on or defending the suit; but the

better rule seems to be that under some circumstances counsel fees and other expenses incurred prior to bringing suit may be allowed to the wife as suit money. 1 *Nelson, op. cit. supra,* § 12.04. The principle of the more persuasive decisions in England and in this country (particularly in Maryland and New York) indicate that the expense of services rendered before suit is instituted, including investigation expenses, may be included in suit money allowable to a wife where such expenses are reasonable and necessary to bringing or carrying on the suit.

The English cases holding that preliminary expenses incurred prior to institution of suit were recoverable from the husband include, among others, *Wilson v. Ford,* L.R. 3 Exch. 63 (1868) ; *Rice v. Shepherd,* 6 L. T. R. (n. s.) 432 (1862) ; *Stocken v. Pattrick,* 29 L. T. R. (n. s.) 507 (Ct. of Exch. 1873) ; and *Ottaway v. Hamilton,* L. R. 3 C. P. D. 393 (Ct. of App. 1878).

In *Wilson,* where it was necessary for the wife to consult a solicitor in order to institute suit, it was held that the reasonable expense incurred for preliminary counsel fees were "necessaries." In *Rice,* where the wife had reasonable grounds for instituting a proceeding for judicial separation, it was held that she was entitled to pledge her husband's credit for necessary expenses incurred prior to the beginning of suit. In *Stocken,* where it was necessary to make certain inquiries on behalf of the wife before suit was filed, the expense of investigation was included in counsel fees and was allowed. In *Ottaway,* where the wife had good grounds for applying to a solicitor for advice, it was stated that his fee for consultation and correspondence with her prior to bringing suit was an expense that was necessary to ascertain whether proceedings ought to be commenced. It was also said that the solicitor could recover the payments he had made to a detective for investigation services rendered after institution of suit. As we read them, the English cases stand for the proposition that expenses preliminary to suit are recoverable from the husband when they have been reasonably incurred and were necessary to bringing and carrying on the suit.

The pertinent cases in this country with respect to payment for detective or investigator charges for services rendered either before or after commencement of suit, other than those in Mary-

land, include (but are not limited to) *Day v. Day,* 96 Pac. 431 (Idaho 1908) ; *Lanyon's Detective Agency v. Cochrane,* 148 N. E. 520 (N.Y. 1925) ; *Dawson v. Greenberg,* 169 N. Y. S. 2d 143 (App. Div. 1957) ; *Chipp v. Murray,* 379 P. 2d 297 (Kan. 1963) ; *Conklin v. Conklin,* 186 N. Y. S. 191 (Sup. Ct. 1921), modified on other grounds in 188 N. Y. S. 141 (App. Div. 1921) ; and *Hopkins v. Hopkins,* 94 A. 2d 222 (Del. Super. Ct. 1953).

In *Day,* where the detective was employed after suit was instituted, the investigation services were deemed necessary in order to afford the wife the same advantage in presenting her case as the husband had in presenting his.

In New York, where adultery is the only ground for divorce, detective fees are not considered to be a necessity in a divorce action, but are allowable in actions for separation, if such expenses are incurred "to protect the interests of the wife." In *Lanyon,* an independent action, it was held that the employment of the detective prior to institution of suit for separation was not necessary because the wife already had enough evidence to bring suit. In *Dawson,* another independent action, the Court, relying on *Lanyon,* held that the husband was not liable for investigation services rendered at the request of the wife in preparation for an action for divorce, but might be liable for such services in a separation action if they were necessary to protect the wife's interests. It is thus apparent that the New York rule is to the effect that the charges of a detective may be allowed for services rendered prior to the institution of suit for separation, but, as in England and in Maryland, the test in determining whether such expenses should be allowed as suit money is "reasonable necessity."

In *Chipp,* an action independent of divorce, where the services of the detective were engaged "long prior to the filing of the divorce action," it was held that the "services of a detective to unearth the reputation, character, assets and activities of a husband at the instance of the wife is not a necessity for which the husband will be presumed to have pledged his credit by reason of the marriage relationship." But even here, it seems that the primary reasons for the Court holding as it did was the fact that the statute (which authorized the allowance

of fees in divorce cases only), had no application to fees for a detective and the further fact that the charges were incurred long before institution of suit and at a time when the services of a detective were not a "necessary."

In *Conklin* (a New York case), as well as *Hopkins* (a Delaware case), it was held that a court is without authority to compel a husband to reimburse the wife for detective charges paid by her for preliminary services rendered in gathering evidence of the adultery of the husband, because such expense, having been paid by the wife, was not a "necessary" for which the husband was liable. The Delaware Court, however, reserved "for another day the question of whether suit money may be awarded for unpaid past expenses."

The relevant Maryland cases include *McCurley v. Stockbridge, supra* (62 Md. 422, 1884) ; *Donigan v. Donigan, supra* (208 Md. 511, 1956) ; and *Weiss v. Melnicove,* 218 Md. 571, 147 A. 2d 763 (1959). In *McCurley v. Stockbridge,* involving the allowance of reasonable counsel fees for services rendered the wife in a divorce action against her deceased husband, this Court had occasion to say that "the principles of the English decisions would seem to be more in consonance with our practice and we shall therefore follow them." In *Donigan,* as hereinbefore stated, we held that the wife's solicitor should be reimbursed for the money he spent for services rendered him in locating witnesses to testify on behalf of the wife. And in *Weiss,* consistent with the English rule that counsel fees for services performed prior to institution of suit are recoverable if they are incidental to bringing suit and were necessary, we held that the husband was liable to the wife's attorney for the fee he charged for representing her in negotiations looking toward a property settlement and for preparing a separation agreement which was never executed.

If we are to continue following the English rule, and we think we should in a proper case, it seems clear that the charges of an investigator for services rendered the wife prior to institution of suit for the purpose of obtaining evidence to support the bringing of actions for divorce or permanent alimony may be allowed as suit money by the chancellor under proper

circumstances. This does not mean that charges for investigation services rendered prior to suit may be allowed as a matter of right in every case. On the contrary, such charges should not be allowed unless the chancellor, in the exercise of his discretion, is fairly convinced by conclusive and satisfactory proof that it was reasonably necessary for the wife to employ an investigator. To that end, the chancellor, among other factors, should give consideration to whether the wife, prior to employing the detective, had sought the advice of competent counsel as to her marital rights and the necessity of employing an investigator to supplement the information and knowledge she then had of grounds for divorce. Furthermore, since a private detective or investigator employed by the wife would be an interested witness, the chancellor should also take into consideration whether his testimony was such as to require undue caution and scrutiny.

In the present case, the chancellor, having found as a fact that it would be difficult, if not impossible, for the wife to obtain the necessary evidence to support her cause of action for permanent alimony without the assistance of the investigator, ruled that the expenses of employing the investigator were a necessary incident to the action therefor. As a consequence, the chancellor ordered the husband to pay that part of the charges which remained unpaid. We affirm this part of the decree. Cf. *Dawson v. Greenberg* and *Donigan v. Donigan,* both *supra.* And see *Weiss v. Melnicove, supra.* The chancellor further ordered the husband to reimburse the wife for that part of the charges she paid out of her own funds. We reverse this part of the decree. See *Conklin v. Conklin* and *Hopkins v. Hopkins,* both *supra.*

Since the charges due the investigator were a part of the expenses incurred by the wife in the prosecution of this action and were reasonably necessary, it follows that the decretal order requiring the husband to pay such part of the charges as remained unpaid can be enforced by attachment for contempt. *McCurley v. McCurley, supra* (60 Md. at p. 189). This is so because, as we have said, suit money, which in this case includes the unpaid part of the charges, is "a sort of alimony."

It is well settled, of course, that the payment of alimony may be enforced by attachment of the husband for contempt. *Brewster v. Brewster,* 207 Md. 193, 114 A. 2d 53 (1955).

> *The decree is modified by reducing the award of alimony and support from $171 per week to $120, and, as modified is affirmed; the decree is affirmed insofar as it requires payment of that part of the charges of the investigator which remained unpaid, but is reversed insofar as it requires reimbursement of that part of such charges as were paid by the wife; and the order dismissing the petition to cite the husband for contempt is reversed; the costs shall be paid by the appellant.*