636 A.2d 455

**Marjorie H. ECKARD**

v.

**William E. ECKARD.**

**No. 49, Sept. Term, 1993.**

Court of Appeals of Maryland.

Jan. 18, 1994.

Reconsideration Denied March 4, 1994.

532

Darrel L. Longest, Germantown, for appellant.

Joseph J. D'Erasmo, Rockville, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

This appeal is from a civil contempt order issued in a divorce action that began in December 1983. The Circuit

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Court for Montgomery County ordered the appellant, Marjorie H. Eckard (Marjorie), to sign a power of attorney authorizing her former husband, William E. Eckard (William), to execute in Marjorie's name and on her behalf the documents necessary for the sale and conveyance of two adjacent, unimproved lots in the City of Cape Coral, Florida. When Marjorie refused to do so she was imprisoned for contempt until released, pending the outcome of this appeal, on a writ of habeas corpus. Marjorie's principal contention is that the Maryland court had no jurisdiction to enter an order affecting the title to realty lying outside of Maryland. As we shall see below, for more than 200 years, courts of equity have issued, enforceable by contempt, the type of order presented here.

Marjorie initiated the action, asserting claims, *inter alia*, for divorce *a mensa et thoro*, for temporary and permanent alimony, for a monetary award based on the identification and valuation of marital property, and for counsel fees. William counterclaimed for divorce *a vinculo*. A decree of absolute divorce was entered in June 1985 under which the other claims in the action were reserved for future determination, and those claims were referred to a master.[1]

The matter was heard before a master on December 23, 1985. The parties, and their attorneys, were present. Counsel for Marjorie announced that the parties had reached an agreement, resolving all of the open legal issues between them, the terms of which he then orally explained for the record. The Florida land "will be sold by the husband, and the net proceeds divided equally, unless the wife chooses to buy the husband's one-half, which she may do prior to his selling it." Counsel explained that William "has agreed that if [Marjorie] wishes to buy the [Florida] lot[s] she may do so by paying half of ninety-five percent of the appraisal value and [William] will undertake to determine what that is." The

---

1. By Md.Code (1984, 1991 Repl.Vol.), § 8–213(b) of the Family Law Article, "[a]ny decree of ... limited or absolute divorce in which the court reserves any power under [subtitle two] is final and subject to appeal in all other respects."

parties acknowledged their understanding that they had entered into a present agreement that was not dependent on subsequent written memorialization of its terms. The agreement was not to be modifiable by any court in the future.

The December 1985 agreement was not reduced to writing, and there was no report by the master recommending any order by the court. Nor was the action voluntarily dismissed. It simply remained an open action, without the docket reflecting any activity.

It appears from the facts recited by the Court of Special Appeals in its unreported opinion on an appeal in this action, referred to *infra*, that in early 1986 William obtained an appraisal of $60,000 for the Florida property. It also seems that by letter in January 1987 Marjorie offered $17,500 for William's half interest, but that that offer was not acceptable. In August 1987, William listed the property with a realtor at $74,900. Counsel for William in September 1987 advised Marjorie of the listing.[2]

In February 1988, Marjorie moved in this divorce action for an order · enforcing William's promise under the December 1985 agreement to pay to her $1,710 per month out of his retirement. William had not made the payments for November 1987 and succeeding months. Marjorie also alleged that the December 1985 agreement had been obtained by William's fraudulent understatement of assets. In addition, she requested a qualified domestic relations order (quadro) increasing the payment to her from William's retirement to $1,804 per month and a monetary award compensating her for the value of marital property fraudulently undisclosed.

Before any ruling was made on Marjorie's motion, in April 1988, buyers offered $74,900 for the Florida property by

---

2. In various papers counsel for William has taken the position that, because Marjorie had not, within a reasonable time, exercised her right to buy his half interest at ninety-five percent of its appraised value, William was free, on behalf of both owners, to offer the property for sale to a third party. That theory's validity has never been adjudicated directly.

submitting a signed contract. William signed it in May. He then sought an order in this action compelling Marjorie to execute documents reasonably required to sell the Florida property or appointing a trustee to sell it.

The motions were heard December 9, 1988, on a record consisting of the court file, a transcript of the December 1985 master's hearing, certain correspondence, the unchallenged factual statements of counsel, and a near hour-long, unsworn statement of facts and of position by Marjorie.

By order docketed December 13, 1988, the court made the following rulings:

1. Marjorie's Motion to Enforce the Agreement was granted "to the extent that the Agreement reached between the parties on December 23, 1985 is hereby incorporated, but not merged, in the original Decree of Absolute Divorce filed in this cause on June 21, 1985";

2. Marjorie's remaining claims for relief were denied;

3. William's summary judgment motion was granted, requiring Marjorie "to perform all acts and to execute all documents necessary for the sale and settlement" of the Florida property; and

4. In the event Marjorie failed to comply with the order described in ¶ 3, the circuit court "shall, upon motion of [William], appoint a Trustee, resident in the State of Florida, to act in the place and stead of [Marjorie] with respect to the sale and settlement of said lots...."

Entry of this order on the docket fully adjudicated all of the claims and constituted final judgment in the action. *See Pappas v. Pappas*, 287 Md. 455, 413 A.2d 549 (1980). No order for appeal was noted. Rather, on January 12, 1989, Marjorie moved for reconsideration, asserting multiple errors.[3] The motion for reconsideration was denied, and that

---

3. Contained in the record extract are copies of letters from Marjorie's attorney to William's attorney, written after judgment and prior to the motion, by which Marjorie offered to buy William's half interest at

denial was appealed by Marjorie. The Court of Special Appeals dismissed that appeal by order of August 10, 1989, for failure to file a brief.

Meanwhile, in the circuit court, William by motion filed April 19, 1989, sought the appointment of a trustee to sell the Florida property. Marjorie opposed. By order filed July 31, 1989, the Circuit Court for Montgomery County appointed a Florida attorney as its trustee "to perform all acts and to execute all documents, in the place and stead of [Marjorie], necessary to carry out the sale and settlement" of the Florida lots.

Marjorie appealed this order. The Court of Special Appeals affirmed by an unreported opinion, filed June 13, 1990. That court held that Marjorie "did not perform as ordered" by the December 1988 order.

Paragraph four of that order had anticipated the appointment of a trustee, but the Court of Special Appeals did not reach the merits of paragraph four in Marjorie's earlier, dismissed appeal. The intermediate appellate court, in its June 1990 opinion, concluded that, "regardless of the validity of the [December 1988] order ... the circuit court certainly did not abuse its discretion in thereafter appointing a trustee pursuant to its December order." (Footnote omitted).

Our chronological review now shifts to Florida, where William sued Marjorie in Lee County, the situs of the property. That suit, invoking both comity and the Uniform Enforcement of Foreign Judgments Act, alleged, *inter alia,* that "[b]y virtue of the settlement agreement being placed before the [Maryland] Court, the parties have placed their property into the jurisdiction of the Maryland Court. . . ." The Lee County court construed the appointment by the Maryland court of a trustee to act for Marjorie as an attempt to partition Florida realty and held that the Maryland judgment was not entitled

---

ninety-five percent of its appraised value and enclosing two separate appraisals, one of December 23, 1988, and the other as of January 6, 1989, each valuing the Florida property at $78,000. These negotiations never came to fruition.

to full faith and credit. In February 1991, the Florida court dismissed William's action. Two months later the prospective purchasers of the Florida lots, who some three years earlier had tendered a signed contract, withdrew their offer, requested a refund of the deposit, and apparently received that refund.

There were some further negotiations between the parties in August 1992. Marjorie offered $28,500 for William's half interest, on the theory that the valuation date, under their agreement, should be as of 1986 when the property was worth $60,000. William rejected, opining that the present value was approximately $100,000.

In September 1992, William petitioned the Circuit Court for Montgomery County to find Marjorie in contempt of the December 1988 and July 1989 orders. That petition proposed that, until Marjorie executed a power of attorney to William under which he could sell the Florida lots, Marjorie be directed to pay into the registry of the court the monthly payments which Marjorie was receiving directly, under a quadro, from William's retirement.

At a hearing on October 26, 1992, the circuit court rejected William's proposal that Marjorie pay over her quadro income, because the court envisioned that hearings would be required every month. Instead, the circuit court directed Marjorie, under threat of contempt, to execute a power of attorney that counsel for William had prepared. The court gave Marjorie until October 30 to reflect and decide.

When she appeared before the court on October 30, Marjorie advised: "I will refuse to sign a power of attorney to my ex-husband hatchetman." The court found Marjorie in contempt, ordered her confined "for a period of at least 120 days as of this juncture," and advised her that she could be released "at any time by simply signing that document."

This appeal followed. Marjorie was released on bail under a writ of habeas corpus. This Court issued the writ of

certiorari on its own motion prior to consideration of the matter by the Court of Special Appeals.[4]

## I

The court order which Marjorie refused to obey directed that she sign a limited power of attorney. That order, in turn, was but a particularization of the final and unappealed December 1988 judgment directing Marjorie "to perform all acts and to execute all documents necessary for the sale and settlement of" the Florida property. Thus, the scope of review on this appeal from the finding of contempt is narrow. Whether the December 1988 order represented a correct application of the law to the facts is not before us.

In *Harford County Educ. Ass'n v. Board of Educ. of Harford County*, 281 Md. 574, 380 A.2d 1041 (1977), school teachers had violated an anti-strike injunction and were fined for criminal contempt. In discussing the scope of review on the teachers' appeal from the contempt order, we said:

"A party enjoined may not violate the terms of an injunction and then attack the injunction collaterally in a contempt proceeding, civil or criminal. Only a complete lack of jurisdiction in the court to grant the injunction and not merely error in granting it could avail a party."

*Id.* at 585–86, 380 A.2d at 1048 (citation omitted). *See also Save–Mor Drugs, Bethesda, Inc. v. Upjohn Co.*, 225 Md. 187, 190–91, 170 A.2d 223, 225 (1961) (same).

*Shapiro v. Ryan*, 233 Md. 82, 195 A.2d 596 (1963), in contrast, reversed an orphans' court adjudication of contempt because a circuit court had assumed jurisdiction over the case and had thereby deprived the orphans' court of its authority. *Id.* at 86–87, 195 A.2d at 599. Nevertheless, were the orphans' court order that was disobeyed "merely erroneous due

4. Without any order to supplement the record, but without any objection by William, the record extract contains a petition filed by William in the Lee County, Florida court for the sale in lieu of partition of the parties' lots. The petition recites the contempt finding and sanction by the Maryland court.

to a mistaken view of the facts or to a mistaken view of the law," an adjudication of contempt "will ordinarily be upheld." *Id.* at 86, 195 A.2d at 598.

■ In the instant matter Marjorie questions whether the December 1988 order correctly applied the law. She submits that the agreement reached before the master in December 1985 was silent as to incorporation of its terms into any decree and that, absent mutual authorization, incorporation may not be accomplished, leaving the court without any basis for enforcing the agreement. These collateral attacks on the December 1988 order are not available, under the authorities cited above. Thus, we intimate no opinion on the merits of these arguments raised by Marjorie. It is within the subject matter jurisdiction of a circuit court to incorporate a separation agreement into a decree. The court does not lose subject matter jurisdiction even if, *arguendo,* that incorporation was accomplished through an error of law.

■ Marjorie also suggests that the incorporation feature of the December 1988 judgment was erroneous because, as phrased, it incorporated the agreement into the decree of absolute divorce entered June 21, 1985. As we indicated above, the decree of divorce did not resolve all of the claims in the action. The other claims were resolved later by the December 1988 judgment incorporating the separation agreement. The circuit court had jurisdiction, and indeed expressly reserved jurisdiction, to decide the other claims. Assuming, *arguendo,* that there was an error in phrasing this 1988 decree, the error could have been raised on direct appeal from the judgment, but the assumed error is not a defect of jurisdictional magnitude. It is not available collaterally to attack the December 1988 judgment in this appeal from an adjudication of contempt for refusing to obey that order, as particularized.

The foregoing analysis also answers a theme that runs through Marjorie's arguments, namely, that William breached the agreement to sell her his interest in the Florida property

which she was and is willing and able to acquire. That contention was also resolved by the December 1988 judgment.

## II

■ Marjorie's principal argument is that the order directing her to execute the power of attorney authorizing William to act on her behalf in the sale and conveyance of realty in another state is beyond the subject matter jurisdiction of the circuit court. She views the order as attempting directly to affect the title to land in Florida. Relying almost exclusively on *Fall v. Eastin*, 215 U.S. 1, 30 S.Ct. 3, 54 L.Ed. 65 (1909), Marjorie asserts that Florida is not constitutionally obliged to give full faith and credit either to the order directing her to sign the power of attorney or to the December 1988 judgment, because a Maryland court has no power to affect the title to real estate in Florida. William replies that the court has in personam jurisdiction to order Marjorie to sign a power of attorney in Maryland. This done, it would not be the decree of the Maryland court that transfers the title to realty in Florida. That is to be accomplished by the deed to some presently unknown purchaser, signed by William for himself and on behalf of Marjorie, as her agent, appointed by her under coercion.

From the standpoint of the historic power of equity, William is correct. Basically, this case involves the maxim that equity acts on the person. The maxim was applied to a problem analogous to that in the present matter in *Penn v. Lord Baltimore*, 1 Ves. Sen. 444, 27 Eng. Rep. 1132 (1750), a case of great significance to Marylanders. There had been a long-running boundary dispute between the Maryland and Pennsylvania colonies, part of which involved the claim by the sons of William Penn to three counties, presently comprising the State of Delaware. The claim was based upon deeds in 1682 from the then Duke of York, later James II of England, although the land conveyed lay south of the fortieth parallel and within the charter of the Maryland province. In 1732, Charles, Fifth Lord Baltimore, and the sons of William Penn had entered into an agreement establishing a procedure for

resolution of the dispute. The Penns sued in the English Court of Chancery to enforce that agreement. Lord Chancellor Hardwick recognized that the court could not enforce its decree in rem. *Id.* at 454, 27 Eng.Rep. at 1139. That was no objection, however, because the strict primary decree in the court, as a court of equity, was in personam. *Id.* Specific performance of the 1732 agreement by the defendant was ordered. *Id.* at 455, 27 Eng.Rep. at 1139. For historical discussions of these events, see E. Green, *The Making of Maryland* 184–99 (1934); J. Gambrill, *Leading Events of Maryland History* 53–56 (1904); M. Andrews, *The Founding of Maryland* 285–300 (1933).[5]

Chief Justice Marshall, writing for the Supreme Court of the United States, addressed this problem and reviewed the old authorities, including *Penn v. Lord Baltimore,* in *Massie v. Watts,* 10 U.S. (6 Cranch) 148, 3 L.Ed. 181 (1810). An action was brought in the federal court in Kentucky to require the defendant to convey land in Ohio to the plaintiff. The plaintiff's theory for equitable relief was that the defendant had obtained legal title to the Ohio land through a fraudulent survey. The trial court held "that the complainant recover of the defendant one thousand acres of land, to be laid off agreeably to the mode pointed out as the proper manner for surveying...." *Id.* at 154, 3 L.Ed. at 184. On appeal the Court affirmed upon the general principle that "in a case of fraud, of trust, or of contract, the jurisdiction of a court of chancery is sustainable wherever the person be found, although lands not within the jurisdiction of that court may be affected by the decree." *Id.* at 160, 3 L.Ed. at 186.

In *Binney's Case,* 2 Bland 99, 144–45 (1829), Chancellor Bland discussed the territorial limitations on the powers of the former High Court of Chancery of Maryland, saying:

---

5. A very comprehensive and scholarly treatment of these events is E.B. Matthews, *History of the Boundary Dispute Between the Baltimores and Penns Resulting in the Original Mason and Dixon Line,* in 7 Md. Geological Survey 103–202 (1908).

"But the jurisdiction of the High Court of Chancery over the matters of which it takes cognizance is co-extensive with the confines of the State itself. ... Wherever a person is to be found within reach of the Court of Chancery, and he may, in any respect, be considered as a trustee, or the matter in dispute arises out of a transitory personal contract[,] not necessarily involving the title to, and following land; and which the party may, by personal coercion, [b]e made to execute specifically, this Court may have jurisdiction and decree accordingly. Therefore, if a defendant be found here he may be decreed to pay money, or to account for the rents and profits of lands lying in another, or a foreign country, which he had held and enjoyed; or if a deed of lands in a foreign country be found to be fraudulent, it may be ordered to be delivered up and cancelled; *or in specific performance of a contract for land in another State, such a conveyance may be ordered as shall be sufficient according to the law of the State were it lies.* But the Court will not decree a partition of such land, or in any manner directly decide upon the title to it, or upon the validity of a deed or will as a material part of the title; nor found the relief granted upon the strict title to such property itself."

(Emphasis added).

*White v. White,* 7 G. & J. 208 (1835), is a holding of this Court, on appeal from the Court of Chancery, that presents an instructive contrast. Sale in lieu of partition was sought of real estate, in both Maryland and Pennsylvania, that had devolved upon the heirs of a decedent. The Pennsylvania law of descent was the same as that in Maryland. The Chancellor entered the decree as to Maryland real estate but dismissed the bill for want of jurisdiction over the Pennsylvania land. *Id.* at 210. This Court affirmed. As to the Pennsylvania land the bill sought a "decree *in rem* where the thing against which the decree goes, and is alone the subject of, and to be operated upon by it, is beyond the territorial jurisdiction of the Chancery Court, and not subject to its authority...." *Id.* This was to be contrasted with a case

"where the decree sought is *in personam*, and may be carried into effect by process of contempt [in which] the Court of Chancery here may have jurisdiction, although it may affect land lying in another State, the defendant being in the State of Maryland, as in a case of trust, or fraud, or of contract. ... In such a case, the decree does not act directly upon the land, but upon the defendant here, and within the jurisdiction of the Court."

*Id.* at 211.

This Court affirmed a decree compelling the execution of a deed to land situated outside of Maryland in *Stansbury v. Fringer*, 11 G. & J. 149 (1840). The land lay in Ohio, but the equity side of the Frederick County Court had jurisdiction over the person of the defendant. Specific performance was granted, and it was ordered that the defendant "shall execute and acknowledge in due form of law, a deed in fee simple, conveying the said land," which was then described. *Id.* at 151. The jurisdiction of the trial court was not questioned on appeal, and the opinion deals only with a mutuality of contract issue.

*Fall v. Eastin*, on which Marjorie relies, was decided in 1909. In a divorce action in the State of Washington, the court ordered that certain realty in Nebraska be set aside as the separate property of the wife, and the Washington court ordered the husband to convey that property to her. Instead, the husband conveyed the property to a third party. The Washington court appointed a commissioner who executed a deed to the wife that was recorded in Nebraska. The wife then brought an action in Nebraska to invalidate the conveyance by the husband to the third party. The Supreme Court of Nebraska, on rehearing, reversed a grant of that relief, *Fall v. Fall*, 75 Neb. 120, 113 N.W. 175 (1907). The Supreme Court of the United States affirmed. The following passage from the majority opinion is relevant to Marjorie's argument.

"[W]e think that the doctrine that the court, not having jurisdiction of the *res*, cannot affect it by its decree, nor by a deed made by a master in accordance with the decree, is

firmly established. ... [W]hen the subject-matter of a suit in a court of equity is within another state or country, but the parties within the jurisdiction of the court, the suit may be maintained and remedies granted which may directly affect and operate upon the person of the defendant, and not upon the subject-matter, although the subject-matter is referred to in the decree, and the defendant is ordered to do or refrain from certain acts toward it, and it is thus ultimately but *indirectly* affected by the relief granted. In such case, the decree is not of itself legal title, nor does it transfer the legal title. It must be executed by the party, and obedience is compelled by proceedings in the nature of contempt, attachment, or sequestration. On the other hand, where the suit is strictly local, the subject-matter is specific property, and the relief, when granted, is such that it *must* act directly upon the subject-matter, and not upon the person of the defendant, the jurisdiction must be exercised in the state where the subject-matter is situated."

215 U.S. at 11–12, 30 S.Ct. at 7–8, 54 L.Ed. at 70–71.

The reasoning in *Fall v. Eastin* does not support Marjorie's position that the Circuit Court for Montgomery County had no subject matter jurisdiction to direct her to sign the power of attorney in Maryland, even if it would indirectly affect property in Florida. *Fall v. Eastin* was not concerned with whether the Washington court could sanction the husband for contempt in failing to obey its decree ordering a conveyance to the wife. Indeed, *Fall v. Eastin* recognizes that obedience may be "compelled by proceedings in the nature of contempt, attachment or sequestration" to a decree directing transfer of legal title to foreign land through an instrument executed by a party who is personally before the court. *Id.* at 11, 30 S.Ct. at 8, 54 L.Ed. at 70.

These principles were restated by this Court in *Donigan v. Donigan,* 208 Md. 511, 119 A.2d 430 (1956). *Fall v. Eastin,* among numerous other authorities, was cited for the general proposition that

"by virtue of its power over a person properly before it, a court of equity may compel him to act in relation to property not within the jurisdiction, as it could in relation to property within the jurisdiction, but that its decrees do not operate directly on the property nor affect the title, but are only made effectual by directing some action on his part, such as the execution of conveyances or the execution or cancellation of other instruments or writings."

208 Md. at 522, 119 A.2d at 434.

Nor does the judicial coercion invalidate the conveyance. *Gilliland v. Inabnit,* 92 Iowa 46, 60 N.W. 211 (1894), is on point. Before his death, a Kentucky resident was ordered by a Kentucky court, as a remedy for a breach of trust, to convey Iowa real property. When the defendant refused, he served several days in prison for contempt, and then executed and delivered the deed. 60 N.W. at 211. Rejecting a contention that the deed was " 'null and void, for the reason that the grantor ... was forced and compelled by duress and against his will ... to execute and deliver said conveyance,' " *id.,* the Iowa court stated:

"It is true that the title to land is to be affected by the decree, in so far as it compels the party to convey, but, as said, by reason of his trust or contract duty he is personally obliged to convey, and that duty may be discharged in one state as well as another, although the land may not be situated in such state."

*Id.* at 212–13.

*See also* Restatement (Second) of Conflict of Laws § 102 comment d (1971) ("[U]nder ordinary circumstances the Y courts would give effect to a deed executed by the defendant pursuant to the order of the X court and in order to avoid punishment by that court."); E. Messner, *The Jurisdiction of a Court of Equity over Persons to Compel the Doing of Acts Outside the Territorial Limits of the State,* 14 Minn.L.Rev. 494, 508 (1930); W. Barbour, *The Extra–Territorial Effect of the Equitable Decree,* 17 Mich.L.Rev. 527, 549 (1919) ("In fact it is believed that no decision will be found in which a deed,

made under the compulsion of a foreign decree, was for that reason held invalid by a court of the situs of the land."); 4 American Law of Property § 18.65(h) & (i), at 788–90 (1952).

From the standpoint of the power of the equity court, there is no difference between compelling, by contempt, the signing of a deed, and compelling, by contempt, the signing of a power of attorney to sign a deed. The Circuit Court for Montgomery County had jurisdiction over the subject matter.

## III

Marjorie urges this Court to hold that the circuit court abused its discretion by sanctioning her for contempt because, in her view, the Florida court will not honor a conveyance signed in her name pursuant to a coerced power of attorney. In support of that contention she refers to the decision by the Lee County, Florida trial court. But Marjorie's contention, as we noted above, is contrary to *Fall v. Eastin*, which gives full faith and credit recognition to in personam decrees.[6]

Marjorie also contends that William's proper remedy was to bring an action for sale in lieu of partition in Florida, where the Florida court could then adjudicate whether Marjorie has a right to acquire William's interest. William, however, based upon the final judgment of December 1988, based upon the order of July 31, 1989, affirmed by the Court of Special Appeals, and based upon the order of October 26, 1992, directing the signing of the power of attorney, had a right to pursue an in personam remedy in Maryland. When Marjorie, after opportunity for reflection, chose deliberately to defy the order of October 26, 1992, the circuit court did not abuse its discretion by confining Marjorie while giving her the key to her release.

---

**6.** *Fall v. Eastin* has not escaped adverse criticism by legal scholars. *See, e.g.,* B. Currie, *Full Faith and Credit to Foreign Land Decrees,* 21 U.Chi.L.Rev. 620 (1959), espousing the thesis that full faith and credit should be given by the state of the situs of the land to a foreign decree, insofar as it determines the rights, *inter se,* of the parties, even if the foreign decree appoints a trustee to convey and thus classically would be considered to be a decree *in rem.*

*JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.*

ELDRIDGE, J., concurs in the result only.