# DISTRICT NATIONAL BANK OF WASHINGTON

## *vs.*

## HENRY MORDECAI AND HERBERT Q. MORDECAI,
### TRADING AS THE SOUTHERN CIGAR COMPANY.

*Novation: essential qualities; never presumed; intention for the
jury; prayers.   Evidence: objections sustained;
when not reversible error.*

For a novation to exist there must be, (1) a previous valid
obligation; (2) the agreement of all the parties to the new con-
tract; (3) validity of such new contract; (4) the extinguish-
ment of the old contract and substitution for it of the new one.
p. 427

A novation is never presumed, and for it to be effected there
must be a clearly definite intention on the part of all concerned
that such is the purpose of the agreement.            p. 427

The question of intention must be decided from all the cir-
cumstances, and it is for the jury, if there is any evidence legal-
ly sufficient to be submitted to them.                p. 428

Where the plaintiff had admitted that the contract sued on
was accepted by it as additional security, a prayer leaving it to
the jury to find a novation is improper.              p. 429

Sustaining objections to evidence is not reversible error when
it appears that the witness was afterwards allowed to testify to
practically the same matter.                          p. 429

*Decided January 14th, 1919.*

## 420 NAT. BK. OF WASHINGTON v. MORDECAI.

Appeal from the Superior Court of Baltimore City.
(HEUISLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE,
THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE,
JJ.

*John L. G. Lee* and *J. Albert Baker,* for the appellant.

*Henry H. Dinneen* (with whom were *Alfred S. Niles* and
*W. Stuart Symington, Jr.,* on the brief), for the appellee.

PATTISON, J., delivered the opinion of the Court.

The action in this case was brought upon a promissory
note, given by the appellee company to Henry Mordecai and
endorsed by him and Herbert Q. Mordecai to the appellant
bank, dated May 19th, 1916, for the sum of two thousand
seven hundred and forty-eight dollars and fifty-two cents
($2,748.52), payable thirty days thereafter. With this note
was deposited and pledged, as collateral security for its pay-
ment, a certificate for three hundred and fifty (350) shares
of the capital stock of the Monumental Cigar Company.

In addition to the pleas of never indebted as alleged and
never promised as alleged, the defendants pleaded: (1) "That
after the alleged claim accrued and before suit, the plaintiff,
for value received released the defendants therefrom," and
(2) "That before this action they satisfied and discharged
the plaintiff's claim by payment."

The trial of the case resulted in a verdict and judgment
for the defendants and from that judgment this appeal is
taken.

There are four exceptions found in the record. Three upon
the rulings of the Court upon the evidence and one to its
rulings in refusing the three prayers of the plaintiffs.

The first and second of these prayers ask the Court in substance to instruct the jury that there was no evidence, legally sufficient, to go to the jury tending to show a novation. This is the main question presented by this appeal.

The pleas were filed by Henry Mordecai and Herbert Q. Mordecai as partners, trading as the Southern Cigar Company, in which it is stated that the company was erroneously described in the declaration as a corporation; and among the docket entries is found an agreement of counsel dictated by the Court that "this suit is not against the corporation but is intended against Henry Mordecai and Herbert Q. Mordecai, whose business is that of the Southern Cigar Company, and that the jury have been properly sworn as to the pleadings."

The record discloses that the note sued upon was signed and endorsed, as stated above, and it, as well as the collateral security deposited with it, was in the possession of the plaintiffs at the institution of this suit. This note was not paid at maturity and the failure of the defendants to pay it resulted in a number of conferences between Mr. Harper, president of the appellant bank, and Mr. Henry Mordecai, in which different means and methods were suggested and discussed by which the note was to be paid.

It seems that Benjamin Mordecai, late of South Carolina, father of Henry Mordecai, had a claim against the Government of the United States for certain cotton taken from him by the Federal Government several months after the close of the War between the States, and that Henry Mordecai, as one of those entitled thereto, had presented a claim therefor to the Congress of the United States, which claim at that time was in the hands of the Committee on War Claims in the House of Representatives.

As stated by Mr. Harper, Mr. Henry Mordecai being unable to meet the obligation at maturity he agreed "to sell his cotton claim and pay his creditors from the proceeds that came from the sale of the claim, 90% on the dollar." The bank assented to this proposition, provided, it was paid by

October 1st, 1916. It was not paid at that time, and as expressed by Mr. Harper, "the proposition went off."

The defendants were also indebted to the State Bank of Maryland, and in an effort to adjust or settle its claim, Mr. Henry Mordecai states that he at the request of Mr. Cloud, its president, called at the bank, and after discussing with him the settlement of the bank's claim against him, he agreed, upon being asked by Mr. Cloud, to make an assignment of his cotton claim to his creditors, "provided the assignment would release witness from all obligation." It was then suggested by Mr. Cloud, that he and Mr. J. Purdon Wright be appointed trustees, with the consent of the creditors, to carry such agreement into effect. The consent of the creditors, including the appellant bank was obtained and in pursuance of the understanding or agreement so made, an assignment of said claim against the Government was executed, under seal not only by Henry Mordecai, but also by his children, who, as the assignment states, will be entitled to their proportionate share of said claim, in case they survive the father.

The assignment contains the following provisions:

"Whereas, the undersigned, Henry Mordecai, individually, and Herbert Q. Mordecai, individually, and Henry Mordecai and Herbert Q. Mordecai, trading as the Southern Cigar Co., are at this time jointly indebted to the District National Bank of Washington, D. C., in the sum of $2,820.49; and

"Whereas, the said District National Bank has agreed to accept an assignment of so much of the interest of the said Henry Mordecai or Corinne Mordecai, his wife, (Mrs.) Alma L. Walker, (Mrs.) Maud M. Cornelius, Walter C. Mordecai, and Herbert Q. Mordecai, his children, should they succeed his interest in said claim against the Government of the United States, in full satisfaction of their claim of $2,820.49 against the said Henry Mordecai and Herbert Q. Mordecai, and individally and trading as the Southern Cigar Co.

"Now, therefore, this agreement witnesseth, That for and in consideration of one dollar ($1), this day paid by District National Bank to the said Henry Mordecai, Corinne Mordecai, his wife, and (Mrs.) Alma L. Walker, (Mrs.) Maud M. Cornelius, Walter C. Mordecai, and Herbert Q. Mordecai, his children, the receipt whereof is hereby admitted, the said Henry Mordecai, Corinne Mordecai, his wife, (Mrs.) Alma L. Walker, (Mrs.) Maud M. Cornelius, Walter C. Mordecai, and Herbert Q. Mordecai, his children, do hereby jointly and severally assign, transfer, and set over to the said District National Bank their and each of their joint, several and respective interests in the said claim filed against the Government of the United States, as hereinbefore set forth, to the extent of $2,820.49, with interest at six per cent. per annum, in full payment and satisfaction of an indebtedness of $2,820.49 owing by Henry Mordecai and Herbert Q. Mordecai, individually and trading as the Southern Cigar Company, to the said District National Bank.

"And all the undersigned do hereby direct, empower and authorize the Treasurer of the United States, and do also direct, empower and authorize any attorney who is representing the interests of all or any of the undersigned in said claim, and do further direct, empower and authorize any person whatsoever who in any manner may have any control of said claim or the funds arising therefrom, to pay to the said District National Bank the sum of $2,820.49, with interest from the date hereof at the rate of 6% per annum, out of all funds of monies which may be paid by the Government of the United States to the undersigned or any of them in settlement of their claim against the United States, this assignment being their full authority so to do, and a receipt written upon this assignment by the said District National Bank or its personal representatives showing the receipt of said sum, will be a full release and receipt from all the undersigned to the Government of the United States or such

424 NAT. BK. OF WASHINGTON *v.* MORDECAI.

Opinion of the Court.                    [133

other party as may pay the said sum to District National Bank or its personal representatives."

The above assignment, executed on the 31st day of January, 1917, was on February 7th, 1917, sent to the District National Bank, enclosed in the following letter to it from J. Purdon Wright:

"Mr. W. W. Cloud, President of the State Bank of Maryland, and myself have been endeavoring for some time to get the affairs of Mr. Henry Mordecai somewhat straightened out and obtain assignments for his creditors from him and his children of their interest in a certain cotton claim made by Mr. Mordecai against the Government of the United States. We have been successful in getting an assignment for each creditor to the extent of his claim against Mr. Mordecai and we are herewith enclosing the assignment made to you. Kindly acknowledge receipt of same.

"In addition to this assignment, we hope to get a demand note from Mr. Mordecai endorsed by his children, payable to us as Trustees for creditors holding assignments against this cotton claim, as per list lodged with us and which we will hold, and under which we will, if the claim is realized, be in a stronger position to collect the money and pay the various creditors holding assignments."

In response to the above letter, E. S. Wolfe, cashier of the District National Bank, wrote Mr. Wright on February 8th, 1917, saying:

"Receipt is acknowledged of yours of the 7th, enclosing assignment executed by Henry Mordecai, and others, in connection with our claim against him.

"We understand that, in addition to this, you are endeavoring to secure a demand note, endorsed by his children, which is to be covered by assignment, and this in turn held by you for our benefit."

Mr. Wright having in the meantime received from Henry Mordecai and his children the demand note, mentioned in his

letter of February 7th to the District National Bank, wrote said bank on March 22nd, 1917, saying:

> "When I sent you on February 7th, 1917, the assignment from Henry Mordecai and his children of their interests in a certain claim made by Mr. Mordecai against the Government of the United States to to the extent of your claim, I mentioned that Mr. Cloud and myself hoped to get a demand note from Mr. Mordecai endorsed by his children, payable to us as Trustees for the creditors holding these assignments against this cotton claim.

> "I beg to report to you that we have finally secured such a note, signed by Mr. Mordecai and endorsed by his wife, Corinne Mordecai, and his children, Walter C. Mordecai, Herbert Q. Mordecai, Maud M. Cornelius and Alma L. Walker. This note Mr. Cloud and I will hold and will endeavor, when the Government pays the claim of the Mordecais, to collect the money and distribute it among the various creditors holding assignments."

The demand note referred to, dated March 15th, 1917, signed by Henry Mordecai and endorsed by his aforesaid children is as follows:

> "On demand after date, I promise to pay to the order of Wm. W. Cloud and J. Purdon Wright, Trustees, or the survivor of them, Sixty Thousand Dollars, with interest at 6%, but only out of any money that may be collected from the United States Government on my claim now pending, and as appears in the House Bill No. 16477, presented in the House of Representatives June 16th, 1916, in the 64th Congress of the United States of America, and it is further stipulated that if said claim is not paid that the endorsers (my heirs) on this note are not to be financially responsible for any part of said note, and that if the said claim is not paid until after the death of Henry Mordecai, the liability of each endorser is to be limited, pro rata, to the amount received by him, as his share of said claim."

Mr. Wolfe on March 23rd, 1917, answered Mr. Wright's letter of March 22nd, saying:

> "We acknowledge receipt of yours of the 22nd, and note you have received on behalf of the creditors of Mr. Mordecai, a demand note from him endorsed by his children, payable to you as trustee for said creditors.
>
> "We will thank you to advise us from time to time the progress of the Government claim."

Mr. Wright further testified that there were probably as many as twenty of these assignments and many of them were promptly returned by the creditors to whom they had been sent, but he could not state whether the District National Bank had or had not returned its assignment. This want of knowledge, however, on the part of Mr. Wright is supplied by the testimony of Mr. Harper, who stated that upon the receipt of the assignment to his bank, he immediately turned it over to his attorneys, and that it was still in their possession at the time he testified. The demand note, Mr. Wright stated, was still in the possession of his co-trustee, Mr. Cloud, but that the correspondence with the creditors of the defendants, regarding the assignment to them, were at the request of Mr. Mordecai, turned over to Mr. Mordecai, and that he and Mr. Cloud were still trustees, although no monies had been collected upon the claim. The assignment was never signed by the bank, nor does it seem to have been drawn with the idea that it was to be signed by it.

Mr. Henry Mordecai, in explaining the amount of the indebtedness $2,820.49, appearing in the assignment, said that it represented what the company owed the bank on two notes, the note upon which the suit was instituted and one for $350 upon which suit had already been entered, and the amount so named in the assignment was the full amount of the indebtedness owing on both of said notes. He further testified that he had no interviews with Mr. Harper between October 1st, 1916, and January 31st, 1917; that he had not been to his

bank since the assignment was made; and that he did not want to be sued on this claim.

It is upon the facts stated above that we are to determine whether the Court below correctly ruled in refusing to grant the prayers of the plaintiff asking for the instruction that there was no evidence legally sufficient to go to the jury tending to show a novation.

A novation is a new contractual relation and contains four essential requisites: (1) A previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the validity of such new contract, and (4) the extinguishment of the old contract, by the substitution for it of the new one. 29 *Cyc.* 1130. Also *Pope* v. *Vagen* (Ind.), 6 L. R. A. 688, and the cases there cited.

Neither the validity of the existing obligation, consisting of the note upon which this suit is instituted, nor the validity of the new contract or agreement, consisting of the assignment of the cotton claim, which is shown to have been assented to by all parties, is here assailed. Thus the inquiry in this case is confined solely, to the existence *vel non* of the remaining element essential to a novation. To wit, the extinguishment of the original obligation, the note sued upon, by the substitution for it of the new obligation or assignment.

A novation may be made by the substitution of a new obligation or contract between the same parties, with the intent to extinguish the old obligation or contract, but it does not result from the substitution of one paper writing for another, or one evidence of debt for another, or one contract for another, unless such substitution is made with the intention of all the parties concerned to extinguish the old one.

Therefore, in order to effect a novation, there must be a clear definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well settled principle that novation is never to be presumed. The intention of the obligor that the existing debt should be discharged by the new obligation must be concurred in by both debtor and creditor. The point in every case, then, is, did the parties

intend by their arrangement to extinguish the old debt or obligation and rely entirely on the new, or did they intend to keep the old alive and merely accept the new as further security, and this question of intention must be decided from all the circumstances. 20 *Ruling Case Law,* p. 366.

The question of intention in this case is one for the jury to decide, if the facts and circumstances reflecting upon such intention are legally sufficient to be submitted to the jury, as tending to show that it was the intention of the parties that the new agreement or assignment was to extinguish the old one. 29 *Cyc.* 1140. Thus the only question that was before the lower Court, in passing upon the plaintiff's first and second prayers, was the legal sufficiency of such evidence. The test to be applied in determining this question has been so often stated by this Court that we think it unnecessary to again state it.

It is claimed by the appellee, when the assignment was executed and delivered to the appellant, that it was understood and agreed that all other obligations given for the indebtedness here sought to be recovered were thereby extinguished; while it is claimed by the appellant that such was not the understanding or agreement, but that the assignment was only an additional security for the payment of said indebtedness.

In passing upon the question presented, we need only examine the evidence in support of the defendant's contention, which we are to assume to be true, and decide whether the same is legally sufficient to go to the jury. This we have done, and after fully considering said evidence, including the assignment itself, the conduct of the plaintiff upon the receipt of it, and the testimony of Henry Mordecai, one of the defendants, we have reached the conclusion that the Court properly acted in submitting such evidence to the jury.

The third prayer of the plaintiff was likewise properly refused. It asks the Court to instruct the jury that if they should find from the evidence "that the notes offered in evidence and admitted by the defendants were not paid at ma-

turity, and further find that the contract offered in evidence was not accepted by the bank, then the verdict must be for the plaintiff."

The plaintiff admits that the contract was accepted by it as an additional security for the debt owing to it, and if it was intended by the prayer to submit to the jury the finding of an acceptance of the contract as a novation, it is clearly bad.

The question, to the admission of which the first exception was taken, was, we think, a pertinent inquiry, and consequently we find no error in the ruling of the Court thereon.

In the second exception, Mr. Harper was asked if Mr. Mordecai ever asked him to return the certificate of the shares of stock of the Monumental Cigar Company, which had been deposited with the note sued on, as collateral security. The question was objected to and the objection sustained. This question, we think, was a proper one, but inasmuch as the witness was immediately thereafter allowed to testify that such collateral was still in the bank and that no demand had ever been made upon him for it, there was no injury to the plaintiff caused by this ruling of the Court.

The exclusion of the question to which the third exception was taken, if admissible, cannot be regarded as a reversible error for the witness was afterwards allowed to state the answer thereto, as in the second exception.

Finding no reversible errors in the rulings of the Court upon any of the exceptions taken, the judgment of the Court below will be affirmed.

*Judgment affirmed, appellant to pay the costs.*