265 Md. 238 (1972)
289 A.2d 285
R.E.C. MANAGEMENT CORPORATION ET AL.
v.
BAKST SERVICE, INC.
[No. 292, September Term, 1971.]
Court of Appeals of Maryland.
Decided April 5, 1972.
The cause was argued before HAMMOND, C.J., and FINAN, SINGLEY, SMITH and DIGGES, JJ.
Charles R. Donnenfeld, with whom were Rodney F. Page, Arent, Fox, Kintner, Plotkin & Kahn, Jerome Stanbury and Stanbury & Topf on the brief, for appellants.
Leon Shampain, with whom were Vaughan & Shampain and George Greenberg on the brief, for appellee.
SMITH, J., delivered the opinion of the Court.
Here "one washing machine operator has a dispute with another washing machine operator." At least that was the comment of Morris Karp (Karp), president of appellant Realty Equities Corporation of New York (Realty Equities), when he was asked if he were familiar with the litigation. He apparently had drawn the inference that the prime dispute here was not between appellee, Bakst Service, Inc. (Bakst), and the various parties *240 appellant, but between Bakst and another corporation which saw a chance to make a profit if it could obtain the concession for its machines in a Prince George's County apartment house where Bakst has had its equipment for a number of years.
Bakst and Jerry Wolman on July 29, 1964, entered into a contract under which Bakst was granted "the exclusive right and privilege to install, maintain and operate any and all commercially operated washing machines and dryers" at "Dodge Park View" apartments at Lanham. (Apparently, the development is generally known as "Dodge View.") The contract was for a period of five years from the time when the apartment groups reached 90% occupancy. The parties have stipulated that the first section reached such occupancy on October 15, 1965; the second, July 10, 1967; and the third, April 10, 1968. The agreement as written applied only to the first section, but it provided that it should "apply to all other sections to be built at Dodge Park View." It was to "automatically renew itself at its expiration for successive 5 year periods, unless [Bakst gave] written notice of cancellation to [Wolman] at least thirty days prior to the expiration of the original term [t]hereof." One thing upon which the parties can agree is that under that contract Bakst was to pay Wolman $2.00 per month for each occupied unit.
In November, 1966, Wolman sold Dodge View to a corporation known as CH No. 13, Inc. (CH 13), a subsidiary of Investors Funding, Inc. The following month the stock in CH 13 was sold to Countrywide Realty, Inc. (Countrywide). CH 13 and Countrywide are among the appellants here. Elmer Litwin (Litwin) was a vice-president of Countrywide concerned with the management of CH 13. In October, 1967, Realty Equities acquired the assets of Countrywide including the stock of CH 13. Litwin then became an officer of Realty Equities and certain of its subsidiaries.
In June of 1968 Realty Equities worked out a plan *241 under which CH 13 sold the real estate to appellant Dodge View Associates, an Illinois limited partnership, but a leasehold interest remained in a subsidiary of Realty Equities Corporation, Appellant Dodge View Realty Corporation. R.E.C. Management Corporation, another appellant and a subsidiary of Realty Equities, came onto the scene as manager of the property in September of 1968. Litwin was an officer of that corporation also.
Just when the R.E.C. group became cognizant of the Bakst-Wolman contract does not clearly appear, but pursuant to a demand under Maryland Rule 421 it is admitted that R.E.C. Management Corporation knew of the agreement from the time it assumed its duties, and that Countrywide and CH 13 had knowledge of the agreement "prior to the time [Bakst] began paying $3.00 per unit." This means the latter two had knowledge of the Wolman agreement sometime prior to April 15, 1967. We shall later discuss the increase from $2.00 to $3.00 per unit.
On March 9, 1967, Bakst was notified by letter from Countrywide that effective April 15, 1967, it would have another laundry machine operator at Dodge View and Hillbrook Towers, another apartment house owned by Countrywide.[1] Bakst was "requested and directed to remove [its] equipment by that date." It was suggested it "coordinate [its] move with Mr. Raport of Solon Industries." Solon Automated Services, Inc. (Solon), is the other "washing machine operator" to whom Mr. Karp alluded. This letter brought a prompt reply from counsel *242 for Bakst stating that contracts for the properties had not expired, that he had instructed his client not to remove its equipment, and that appropriate legal action would be taken to protect his client's interest if Countrywide or its agents breached "either or both of these contracts." Hillbrook Towers is not involved in this dispute. Around April 15, 1967, Bakst began paying $3.00 per unit. The explanation of Milton Baxt (Baxt), vice-president of Bakst, for this increase was:
"It has to do with public relations. It has to do with good business too. You are making money. We gamble on these things and what we do is set up a price on a gamble. This is prior history on this and $2.00 we thought would be a fair price. When you make money on a project, and we have made a lot of money on this project, and if a man comes up and says to you, `$3.00,' and it is a fair deal, you want to live with your contract so you pay him $3.00. I have this every day in the week."
A number of proposed contracts were submitted to Countrywide by Bakst. Then on June 15, 1967, Litwin, as executive vice-president of Countrywide, wrote Baxt enclosing a comprehensive memorandum from Countrywide's attorney setting forth the changes desired by Countrywide in the proposed contract submitted by Bakst. This was followed by a letter from Baxt to Litwin on July 6 "enclosing the new contracts which were drawn up after [Bakst's] attorney spoke with Mr. Roll [attorney for Countrywide]."
On July 19 Roll wrote to Milton Raport of Solon:
"This is in reference to your letter to Mr. Elmer L. Litwin dated July 10, 1967 concerning laundry equipment service for various apartment projects in Maryland.
"We are glad to note that Solon Automated Services, Inc. would be willing to stand the cost *243 of any legal problem we might encounter relative to previous laundry equipment agreements. However, we feel that a more specific agreement covering this problem would be necessary and that it should be included as a clause in your laundry equipment agreement. A draft of such clause is enclosed.
"The various apartment projects in Maryland are each owned by a separate corporation which is a subsidiary of Countrywide Realty, Inc. Accordingly, instead of a contract with Countrywide it would be necessary for you to have a separate laundry equipment agreement covering each location with the corporation which is the owner of such location. The enclosed clause would, therefore, be added in the laundry agreement covering each location.
"Your letter does not indicate which apartment locations are involved. We suggest that the name of the owner be left blank in each agreement and the name of the owner can be inserted when the agreements are submitted to us for approval."
On August 1, 1967, an agreement relative to Dodge View was entered into between Solon and CH 13, executed by Litwin as vice-president, the 15th paragraph of which contained the language forwarded by Roll in the July 19 letter, namely:
"In the event that there is any previous laundry equipment agreement relative to the premises between a previous owner and another laundry equipment operator, Solon Automated Service, Inc., agrees, at its own cost and expense, to assume sole responsibility for removal of any and all equipment now on the premises covered by such agreement and to defend, indemnify and hold the owner herein harmless against any and all claims, actions, proceedings, judgments, *244 and liability for damages, costs and expenses arising from or relating to any removal of such equipment, and/or any alleged breach of such agreement on the part of the owner herein, and/or any attempt to enforce such agreement against the owner herein."
The agreement was "for a period of ten years, commencing on the date of the completed installation [t]hereunder." It provided that during the term of the agreement CH 13 would "not install, nor permit the installation or use of like or similar equipment, description or design in the apartment premises."[2] Thus arises the conflict to which Mr. Karp made reference. From the depositions the inference can be drawn that Solon was financing the litigation in this case in the circuit court and, therefore, presumably, here. Notwithstanding that agreement, the Bakst machines remained on the premises.
There was no apparent effort to bring about removal of the Bakst machines until the spring of 1969. On March 6 of that year Litwin sent a memorandum to Chelec, one of his subordinates, as follows:
"With reference to your Feb. 27 letter from Donnenfeld, it is important that you check the expiration dates of the Bakst contracts.
"In addition I want to know the exact dollars we are receiving from him at both locations.[3]

*245 "Do not send out any cancellation letters until you discuss this matter with me, in person, when I am down there on 3/11"
On March 10 Baxt sent Chelec yet another proposed contract. On March 18 Chelec as "property manager" of R.E.C. Management Corporation wrote to Bakst:
"This has reference to your Company's laundry machine installations at the Dodge View apartment property which is managed by this office. As you know, you have been servicing this property under contract with the former owners thereof.
"Without conceding the validity of this prior contract insofar as the present owners are concerned, the contract has now expired, and the present owners wish to utilize the services of a different laundry machine operator. Accordingly, you are hereby directed to remove your equipment from the Dodge View apartment project as soon as possible and, in any event, no later than July 28, 1969. Royalty payments due for periods prior to the removal of your machines should be made to this office.
"In order to reduce the inconvenience caused by this change-over, you may care to coordinate your move with the undersigned of this office. We would also appreciate some advance indication as to when the removal of your equipment will take place."
On April 30 Litwin wrote to one of his superiors advising that he had "met with Raport and resolved the final washing machine contract problems." He then went on to say:
"The remaining two Bakst contracts, Dodge View and Hillbrook Towers, which expire within the next few months, will be renewed by Solon."
*246 On June 3 counsel for Bakst wrote Chelec that he had been handed the March 18 letter for reply, that he had "examined the contract and [was] of the opinion that the contract ha[d] not expired and [was] still in force." On June 4 Chelec forwarded a copy of that letter to Litwin, sending Raport a copy of the memorandum "along with copies of the original contracts." On June 6 Litwin wrote Raport:
"I know that Ziggy [Chelec] sent you certain correspondence pertaining to the Bakst laundry contracts at Dodge View and Hillbrook Towers.
"I want to make certain that we understand that the same arrangements exist in this matter as existed in the Hoff Laundry matter in that any legal expense involved, as per the June 3 letter from Bakst's attorneys, are entirely the responsibility of Solon Industries. Please confirm this in writing to me by return mail. I assume that you will have your attorneys reply to the June 3 letter immediately."
There were statements in some of the depositions to the effect that Bakst's services were unsatisfactory. The complaints were not spelled out with precision. It is noted that at one point in the Litwin deposition the record was:
"Q. Did you have any personal knowledge of Bakst's operation over at Dodge View; that is, whether they were doing a good job or a lousy job, or whatever? A. No. I would have to assume that he was doing a fair job, and I would also have to assume that there were the usual complaints.
"Q. But nothing extraordinary that is not incidental to that type of operation? A. I would have to admit that I knew of nothing that was completely bad, shall we say, or that I was put on notice that his operation was unlivable, for use of a better term.

*247 "Q. And would it be a fair characterization that the only motivation in dealing with Solon was a question of economics? A. I would have to assume that that would be a fair statement; a question of dollars and cents."
Accordingly, the inference is drawn that Bakst's performance was not the reason for the attempted termination.
It is a little difficult on occasion to follow the relationship between the various corporations here. Karp, the president of Realty Equities, was chairman of the executive committee and chief executive officer of Countrywide prior to the time that Realty Equities acquired Countrywide. As of the time that the stockholders of Countrywide were requested to vote upon that transfer, Realty Equities owned 5.75% of the common stock of Countrywide.[4] On July 24, 1967, Karp directed Litwin, "[w]ith reference to all Wolman properties, send detailed information concerning washing machine contracts to Mr. Benjamin Duhl, as soon as possible."[5] At the bottom of that memorandum, in longhand, appears a listing of various apartments. Opposite Dodge View and Hillbrook with a bracket appears "Bakst Service." An expiration date is listed for each of the projects and opposite Dodge View appears "7/29/69." Litwin admitted that the longhand is his. It is to be noted that *248 July 29, 1964, is the date of the Bakst contract. It was for five years, although five years from the time that the apartments were 90% occupied. This apparently was the raw material from which Litwin wrote Duhl under date of August 2. He there listed the expiration date for Dodge View as "8/1/70." Litwin in his deposition said that in his letter to Duhl he must have been referring to the Solon contract. That does not work out mathematically since it was dated August 1, 1967, and was for ten years.
In the transfer that took place in 1968 there was an agreement entered into under date of May 23 between CH 13, as seller, and certain individuals on behalf of the limited partnership which acquired the premises, as buyer. This agreement provided that the premises were sold and were to be conveyed subject to:
"The contracts and agreements, if any, referred to on Schedule I annexed hereto, and renewals of same, all of which Purchaser agrees to assume by instrument in writing delivered to Seller at the closing."
A lease was entered into at that time between CH 13 and Dodge View Realty Corp. by which Dodge View acquired the leasehold interest. The lease was made subject to a number of items including:
"Dedications, covenants, consents, easements and agreements, if any, made or given by any prior owner of the Demised Premises, whether or not recorded."
Also filed in evidence was an exhibit entitled "Statement of Closing of Sale of Premises known as Dodge View Apartments, Prince George's County, Maryland held at the office of Realty Equities Corporation of New York on June 10, 1968." It lists the "appearances" of certain individuals including Litwin on behalf of CH 13, two general partners on behalf of Dodge View Associates, and *249 Litwin on behalf of Dodge View Realty Corp. That document recites:
"Seller executed an Assignment of the service contracts and agreements referred to in Schedule I of the Agreement to Dodge View Realty Corp."
A schedule of service contracts and agreements was appended. The name "Bakst Service, Inc." appears in that schedule.
Bakst instituted a declaratory judgment proceeding in the Circuit Court for Prince George's County. Parties defendant were R.E.C. Management Corp., Realty Equities, the general partners of Dodge View Associates, Dodge View Realty Corp., CH 13, Countrywide, Realty Equity Management Corporation, Realty Equity of LeHavre Corporation, and Realty Equities Countrywide, Inc., all of whom are appellants here.
After extensive discovery, the matter was ultimately submitted to the court on the entire record "for decision, on cross-motions [for summary judgment] or otherwise, without trial." Further testimony was to be at the option of the court. The chancellor (Bowie, J.) denied both motions for summary judgment. He wrote a comprehensive opinion and then entered a decree to the effect that the term of the license for Bakst in the first section expired on October 15, 1970, and was automatically renewed according to the contract; that the term of the license for the second section will expire on July 10, 1972; that the term for the third section will expire on April 10, 1973; and that the right of cancellation as to the second and third sections rests solely with Bakst upon the expiration of the original terms on July 10, 1972, and April 10, 1973, respectively.
Judge Bowie grounded his opinion on novation. In Nat. Bk. of Washington v. Mordecai, 133 Md. 419, 105 A. 586 (1919), to which he made reference, Judge Pattison said for the Court:

*250 "A novation is a new contractual relation and contains four essential requisites: (1) A previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the validity of such new contract, and (4) the extinguishment of the old contract, by the substitution for it of the new one. 29 Cyc. 1130. Also Pope v. Vagen (Ind.), 6 L.R.A. 688, and the cases there cited." Id. at 427.
Judge Bowie took each of those points, discussed them, and concluded that a novation existed.
Appellants have no quarrel with the elements of a novation listed by the chancellor. They say that while the existence of the first element, a valid contract, may not be an issue, the remaining elements are not present. They concentrate their fire particularly on the fact that there is no evidence that the parties agreed to the discharge of Wolman and the substitution in his place of the new owners, and the strong contention that enforcement of a new contract would be barred as a matter of law under the statute of frauds as an executory contract not to be performed within one year, claiming "it is not evidenced by a signed writing." They urge that the contract with Bakst is simply one terminable at will insofar as they are concerned, a point which seems at variance with the references to expiration dates in some of the memoranda to which we have referred.
It is obvious from the record that the owners of the apartment house were conscious of the presence of the Bakst machines, as well they had to have been, for, as Judge (later Chief Judge) Bartol said for our predecessors in Smoot v. Rea, 19 Md. 398 (1863), quoted by Judge Bowie:
"It is well settled, that `what is sufficient to put a purchaser on inquiry, is good notice, that is, where a man has sufficient information to lead him to a fact, he shall be deemed conusant of it.' Magruder v. Peter, 11 G. & J. [217,] 243. *251 Price v. McDonald, 1 Md. [403,] 419. Many other authorities might be cited to the same effect." Id. at 412.
We do not share the view of the appellants that the repeated Bakst efforts to obtain a contract with the R.E.C. group is in some way evidence that it had no contract. This apparently was a highly profitable operation. Bakst knew that in due season it would be ousted by Solon unless it could somehow satisfy the Realty Equities people. Its people may well have thought that if they could satisfy that group they might be able to get into other apartment projects owned by subsidiaries of Realty Equities in the Washington area and thus have access to other highly profitable operations.
In the view we take of this case it is not necessary for us to find a novation and the consequent discharge of Wolman in order for the appellants to be bound. The appellants are bound if those presently owning and leasing the realty elected to assume and be bound by the Bakst-Wolman contract. They could be bound without a discharge of Wolman. Therefore, we do not determine whether there was or was not a novation.
As was stated by the Court in Cole, Adm'x v. Wilbanks, 226 Md. 34, 38, 171 A.2d 711 (1961), "[a]ssent to an offer to vary, modify or change a contract may be implied and found from circumstances and the conduct of the parties showing acquiescence or agreement." Or, as Judge Chesnut put it in MacKenzie Laboratories v. Lawrence, 80 F. Supp. 710, 713 (D. Md. 1948), in speaking of the necessity for a formal contract of novation (quoted in Gulf Oil Corporation v. Texas City Refining, 218 F.2d 196, 200 (4th Cir.1954)), "It is * * * not necessary to show an express consent of the parties as it may be implied and inferred from circumstantial evidence." Accordingly, it follows that an intent to assume the Bakst contract could be found from similar evidence, the only barrier being the necessity of satisfying the statute of frauds.
*252 On the issue of the statute of frauds it is important to bear in mind the statement of Judge Parke for the Court in Crawford v. Obrecht, 171 Md. 562, 189 A. 809 (1937):
"`As the purpose of the statute,' in the words of Williston, `is to require a formality of proof in order to make a contract enforceable, not to impose a new rule of law as to what constitutes a valid contract, it is immaterial with what purpose the requirement of the statute is fulfilled.' Williston on Sales (2nd Ed.) sec. 106. The memorandum need not be contained in one writing, nor, if there are several documents, need they be physically attached to one another, if their contents show a connection with the bargain sought to be enforced. If all the papers are connected so as to constitute a writing which has been authenticated as a whole by the signature to a separate part, the statute is gratified so far as the signer is concerned. The memorandum and its constituent parts may be in any form. It may be a well prepared written contract, but it may also be, in whole or in part, in the form of a letter or letters or of a telegram." Id. at 570.
Also testimony recorded in open court, under appropriate circumstances, will take the case out of the statute. Friedman v. Clark, 252 Md. 26, 32, 248 A.2d 867 (1969), and cases there cited including Trossbach v. Trossbach, 185 Md. 47, 42 A.2d 905 (1945), where Judge (later Chief Judge) Markell said for the Court:
"Under existing procedure, the purpose of the Statute of Frauds is to protect a party, not from temptation to commit perjury but from perjured evidence against him. The purpose of evidence is to prove facts. Admissions of a party in testifying, though in form evidence, are in *253 essence not mere evidence, but make evidence against him unnecessary. Cf. General Rules of Practice and Procedure, I, Rule 1; II, Rules 1, 2, 4, 6; Scheihing v. Baltimore & O.R. Co., 180 Md. 168, 169, 174, 23 A.2d 381. We think the Statute of Frauds requires no more.
"Furthermore, admissions of a party in the form of testimony would constitute sufficient `memoranda' under Section 4 or Section 17, or `writings' under Section 7, of the statute. For this purpose we think recorded testimony should be regarded as equivalent to signed depositions." Id. at 55-56.
In this regard it was interesting to note the deposition of Mr. Michael Weinberger, vice-president of several of the appellant corporations including R.E.C. Management Corporation, which he said was acting as agent for Dodge View Realty Corp. He quoted Litwin whom he succeeded. Weinberger said he asked Litwin for some background on the Bakst situation. In response to a question as to what Litwin said, Weinberger testified:
"A. I asked him what basically, I asked him for some background and he gave me some background as to what was happening and why it was happening.
"Q. What did he say? A. He said that they were very unhappy with the service as it was being performed and they got very little cooperation from Bakst and the machines were not kept properly and the rooms were not kept properly, and they were terminating the contract or they were terminating it.
"Q. Who was terminating it? A. Litwin had begun taking steps."
One is not obliged to "terminate" a contract upon which one is not bound. The testimony relative to the performance of Bakst is at variance with Litwin's testimony.
*254 The mandate of Maryland Rule 886 that when an action is heard by the trial court without a jury "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous" is applicable notwithstanding the fact that the judge did not have the opportunity to see and hear the witnesses. On this subject Chief Judge Brune said for the Court in Sewell v. Sewell, 218 Md. 63, 145 A.2d 422 (1958):
"On the record before the Chancellor and before us, we are not prepared to say that the Chancellor was clearly in error. Where he has not seen and heard the witnesses, the concluding portion of Rule 886 a of the Maryland Rules requiring that due allowance be made for the opportunity of the lower court to judge the credibility of the witnesses is not applicable, and the written testimony is as available to us as to the Chancellor; but the fact that he did not have the witnesses before him does not vitiate the first portion of that Rule which requires this Court to review a case tried by the court without a jury on both the law and the evidence, and prohibits setting aside the judgment of the lower court on the evidence unless clearly erroneous. See Oliver v. Oliver, 217 Md. 222, 140 A.2d 908." Id. at 71.
Restatement of Contracts § 216 (1932) states:
"The loss or destruction of a memorandum does not deprive it of its effect as a satisfaction of the Statute, and oral evidence of the making and contents of the memorandum is admissible."
We have no lost memorandum here. We do not have in evidence a memorandum in which the present owners of the real estate, Dodge View Associates, and the lessee, Dodge View Realty Corp., agreed in so many words to be bound by the Wolman contract. We do have a contract, however, between Ch 13 and the present owner in which the present owner agreed "to assume by instrument *255 in writing delivered to Seller at the closing" certain contracts of which the Bakst contract was one. We do have a memorandum (the minutes of the closing) which reflects that CH 13 executed an assignment of the service contracts referred to, of which the Bakst contract was one, to Dodge View Realty Corp. Accordingly, the inference can be drawn that the Bakst contract was in fact assigned to that corporation. The terms of the lease between CH 13 and Dodge View were that the lease was subject to agreements "made or given by any prior owner of the Demised Premises, whether or not recorded." When all of that is added to the other extensive evidence to which we have referred, we cannot say that the chancellor was clearly in error in concluding that the Bakst-Wolman contract not only was assumed by each succeeding owner of the apartment complex and the present lessee, but that there was also sufficient evidence to satisfy the statute of frauds. Both of these points were implicit in his finding of a novation. These conclusions are sufficient. Therefore, the decree must be affirmed.
Decree affirmed; appellants to pay the costs.
NOTES
[1] The letter stated it would "confirm [the writer's] telephone conversations with your Mr. Bakst." Bakst is the name of the president and founder of Bakst. He did not testify, nor did the author of the letter. The vice-president of Bakst involved in negotiations here did testify. He is a nephew of the founder, but spells his name Baxt. The demand of certain of the appellants on Bakst for admission of relevant facts asked for an admission that Milton Baxt, the nephew, had a telephone conversation "in February or early March of 1967" with the author of the letter in which Baxt was advised that Countrywide wished the Bakst machines removed from Dodge View Apartments. It was denied that such a conversation took place.
[2] The agreement said Solon was granted permission to install machines under "the following schedule." The schedule stated, "a minimum of machines as now installed 90 washers and 45 large dryers." (Emphasis added.) "As now installed" apparently referred to the Bakst machines because no Solon machines ever have been installed.
[3] The author and the date of preparation do not appear, but there is in the record a memorandum headed "LAUNDRY COLLECTIONS" on the stationery of R.E.C. Management Corp. It lists the sums collected from Dodge View between October 17, 1968, and March 11, 1969, a total of $9243.00, with varying amounts each month. Baxt said his office checked with the apartment complex each month to ascertain how many units were occupied and then paid accordingly.
[4] Appellants in their brief object because the chancellor found, "in effect, that the present owners were `shrewd' real estate operators who had to know of that Bakst-Wolman Contract." (Emphasis theirs.) Actually, he described them as "no strangers to the world of real estate transactions." It is noted that the data submitted to Countrywide's stockholders listed 26 properties owned by Countrywide including 11 apartment complexes in Maryland adjacent to the District of Columbia. Accordingly, they can hardly be called neophytes in the real estate world.
[5] Karp explained this request in his deposition:

"Ben Duhl is a friend of mine, we do quite a bit of business with him. He is a mortgage lender and at one point in talking to him about some mortgages, he commented that he might be interested in creating something for his son that related to washing machines. I told him I knew nothing about it, but I would turn it over to Litwin."