AUTOMATIC RETAILERS OF AMERICA, INC. *v.*
EVANS CIGARETTE SERVICE COMPANY

[No. 235, September Term, 1972.]

*Decided May 18, 1973.*

The cause was argued before Murphy, C. J., and Barnes, Singley, Smith, Digges and Levine, JJ.

*Donald N. Rothman* and *S. Booker Carter, Jr.,* with whom were *Edward E. Obstler* and *Gordon, Feinblatt, Rothman, Hoffberger & Hollander* on the brief, for appellant.

*Joseph S. Kaufman,* with whom was *H. David Gann* on the brief, for appellee.

Digges, J., delivered the opinion of the Court.

We are here concerned with a contract which appears innocent on its face but its effect is made complicated by a series of corporate mergers and transactions. This apparently simple agreement is the basis of this equity action brought in the Circuit Court No. 2 of Baltimore City where Judge Meyer M. Cardin awarded the plaintiff damages for its breach. In order to understand the dispute, its rather complex fact pattern must be set forth in some detail.

Late in 1959, in an effort to supply some sustenance for the large number of workers employed in the then recently completed Social Security Building, located near Baltimore City, the General Services Administration (GSA) awarded a contract to the Warr-Bach Catering Company. By the terms of their agreement Warr-Bach was required to operate a cafeteria and maintain a vending machine service, including

one for cigarettes, in the Social Security Building. In furtherance of this understanding the catering company verbally subcontracted the vending machine privileges to the Vendomat Corporation of America which, in turn, on March 24, 1960 entered into a written supply contract with the Evans Cigarette Service Company, the plaintiff below and appellee here. By this latter agreement, Evans was obligated to supply cigarette vending machines as well as an inventory of cigarettes and matches. In return, Vendomat promised to keep the machines stocked, to collect all receipts from the machines, and remit the balance to Evans after retaining a 3¢ per pack commission. But at no time did Vendomat obtain title to either the machines or the inventory. This business relationship was to continue as long as the condition set forth in clause 11 of the contract existed unless sooner terminated at Vendomat's option upon the happening of any one of three specified events. Clause 11 provides that:

"This Agreement shall continue in effect as long as Vendomat has the *privilege* and *ability* to maintain cigarette vending machines in the Social Security Building." (Emphasis supplied.)

And the events which authorize earlier termination were if: (i) S. Moe Kaminsky, president of Evans, dies or no longer has the right to vote 50% of the company's voting stock; (ii) Evans or Mr. Kaminsky enters into competition with Vendomat in any field of business except the vending of cigarettes; or (iii) Evans relinquishes dominion, title or control to the machines.

The Vendomat-Evans business relationship continued until mid-1961 when Automatic Food Systems, Inc. (AFS) entered the picture. In July of that year, the shareholders of Vendomat unanimously agreed to exchange all issued and outstanding shares of their corporation with AFS in return for shares of stock in that company. At the same time, a supplemental agreement was entered into which provided that additional shares of AFS stock were to be placed in escrow and transferred periodically to the former shareholders of Vendomat if the Warr-Bach agreement with Vendomat was still effective on specified dates. In

effect, for a specified period, the longer the Warr-Bach agreement with Vendomat was kept in force, the greater the number of shares of AFS stock the former Vendomat shareholders were to receive. It is clear, therefore, that a significant factor in this merger was Vendomat's contract with Warr-Bach. It should be noted at this point that AFS was aware of Vendomat's relationship with Evans as their understanding was listed in a schedule, captioned "Contracts With Suppliers", which was attached to the stock acquisition agreement.

Just six months after the Vendomat-AFS merger, a second significant corporate arrangement occurred when Automatic Retailers of America, Inc. (ARA), the defendant below and appellant here, acquired all of AFS's assets, including its Vendomat stock. In connection with this acquisition, ARA agreed to assume, be responsible for, and discharge all contractual obligations, as well as all other liabilities of AFS. This agreement specifically included the Vendomat-Evans contract; but excluded taxes and other exceptions.

Throughout the entire period beginning with Vendomat, then with AFS, and finally with ARA, Evans continued to supply the vending machines and the inventory of cigarettes as required by the original Vendomat agreement. It is undisputed, and we think it is significant, that Mr. Charles Stouffer, the business manager of Vendomat, continued in that same capacity for each of the succeeding concerns. At the request of Stouffer, then acting as manager for ARA, Evans agreed in 1963 to substitute mechanical for electric vending machines. In addition, in that same year, ARA and Evans negotiated for a different rate of commission to be retained by ARA. In short, ARA and Evans dealt with each other in all ways just as Vendomat and Evans had.

Beginning in January of 1962, the assets of Vendomat were gradually transferred to ARA. Finally, that corporation ceased to exist when its charter was forfeited in late 1963 by a proclamation of the Governor for failure to pay franchise taxes.

On February 14, 1965, in accordance with its terms, the

original prime contract between the General Services Administration and Warr-Bach came to an end. However, it was extended for one more year while bids were received for a second prime contract. During 'this extension, Evans continued to supply cigarettes and machines so that ARA could carry out its obligation to Warr-Bach. After considering all bids, the General Services Administration again awarded Warr-Bach the prime contract, but this time under different terms and conditions, with compensation based on a per item flat fee for each item sold rather than a management commission. The second contract also provided for the installation of new machines. Warr-Bach then subcontracted the vending machine business to ARA which, on March 18, 1966, informed Evans that it was giving notice that their understanding had ended as of the termination of the first government contract. On March 25, Evans informed ARA that it considered the agreement still binding and, though their machines would be removed, court proceedings would be brought. As promised, Evans docketed this equity suit seeking to enjoin ARA from interfering with operations under their supply contract, and an accounting as well as monetary damages. While this suit was pending, on December 8, 1967, Mr. Kaminsky died and ARA promptly exercised the option set forth in the Evans-Vendomat contract to terminate it. In this notice, ARA stated that it was doing so without prejudice to its position that the contract had already ended. This election to terminate mooted the injunction request and the case proceeded as one for damages arising from breach of contract. The continuation of these proceedings is proper, as once equity has obtained jurisdiction, it may continue to resolve the dispute between the parties though the equitable issues have dissipated and only legal issues survive. *Hardisty v. Kay*, 268 Md. 202, 299 A. 2d 771 (1973); *Ledford Const. Co. v. Smith*, 231 Md. 596, 191 A. 2d 587 (1963) and the cases cited therein.

Here appellant argues that, under the contract, when Vendomat was merged and liquidated, or certainly when the first prime contract came to an end, Vendomat ceased to have "the privilege and ability to maintain the cigarette

vending machines in the Social Security Building" and the agreement was therefore at an end. Concomitant with this allegation, ARA further argues that it was a separate corporate entity from Vendomat and as the Evans-Vendomat contract, particularly clause 11, did not specify that it would be binding on Vendomat's successors and assigns, that agreement in no way affected the relationship between ARA and Evans. Therefore, it says, the continuance of business, from the time of the liquidation up until its termination in March of 1966, was evidence merely of a contract at will rather than being indicative of an assumption by ARA of the obligations under the original supply agreement. Appellee, of course, sees it differently and posits that because of the merger ARA is in reality Vendomat; or, in the alternative, argues that if Vendomat had indeed ceased to exist ARA has nevertheless by its conduct acquiesced to an assumption of all of the responsibilities of Vendomat including its contract with Evans. It follows therefore, Evans says, that ARA is bound by that agreement.

Judge Cardin, the chancellor, agreed with the appellee and ruled that the termination of the first prime contract between Warr-Bach and GSA and the awarding of the second one between the same parties did not terminate the relationship started by Vendomat and continued by ARA with Evans. He decided that AFS and ARA were parties to the supply contract, as Vendomat had been, because by their conduct they affirmatively acquiesced to their being substituted for Vendomat, and by their actions impliedly agreed to be bound by the contract in question. As curious as it may be, both ARA and Evans state that clause 11 of the supply contract is clear and unambiguous but, as we have already indicated, each thinks that its terms compel a result favorable to it. However, our recent decision in *R.E.C. Management v. Bakst Serv.*, 265 Md. 238, 289 A. 2d 285 (1972), a case with a factual pattern remarkably similar to the one at hand, makes a determination of whether ARA is in fact Vendomat, or its successor or assignee, irrelevant. In *R.E.C. Management,* we held that where the conduct of a party demonstrates an intent to assume the terms and

conditions of a contract between its predecessor and a third party it becomes bound by that agreement just as if it were in fact its predecessor. In that case, as here, there was a series of corporate mergers and acquisitions of assets. There each corporation along the chain of control was aware of an executory contract to provide laundry machines for a commission and each assigned all obligations to its successor. Again, this is similar to the case here where the documents effecting the transfer of Vendomat stock to AFS and AFS's assets to ARA both listed the Vendomat-Evans contract. Finally, in both cases, the successor corporations argued that their continued dealings with the franchisee were evidence merely of a contract at will. However, just as this Court held in 1971 in *R.E.C. Management,* so are we constrained to hold here, that where the chancellor makes a finding, supported by competent evidence, that the parties by their conduct demonstrate an intention to assume the obligations of a contract and be bound by it, we will not disturb such a finding unless clearly erroneous. Maryland Rule 886. Sound reasoning does not become less so with only the passing of three calendar years. Therefore, even assuming without deciding, that ARA is not Vendomat and that the Evans contract was binding at its inception only on Vendomat, we think the subsequent business relationship between Evans and ARA demonstrates, as found by the chancellor, an intent on the part of the parties that ARA would assume Vendomat's entire obligation and each be bound to the other under it. Clearly, it is not necessary to show express consent as it may be inferred from action. *R.E.C. Management, supra.* The record here provides ample evidence of this intent: from the time of the merger until March 1966 ARA at all times behaved as if it were Vendomat and Evans treated it as if it were; and performance and management were identical regardless of whether Vendomat, AFS, or ARA conducted the operation. It is irrelevant whether ARA could have terminated the agreement upon the demise of Vendomat because it did not — it assumed the contract. Therefore, just as the two corporations assumed it, so are they bound by it; and just as they benefited from it, so are they controlled by it.

Once we substitute ARA for Vendomat in the Evans contract, a question remains as to how long the agreement between ARA and Evans was to last. The answer is governed by the contract itself:

"This Agreement shall continue in effect as long as [~~Vendomat~~ ARA] has the privilege and ability to maintain cigarette vending machines in the Social Security Building."

When ARA obtained a new subcontract under the second prime contract from Warr-Bach, it thereby retained the privilege and ability to maintain cigarette vending machines in the Social Security Building. And, it did so without interruption. Nowhere did the parties say in the contract, as they might have, that the agreement would automatically expire at the end of the life of the first prime contract. And when, as here, "a contract is plain as to its meaning, there is no room for construction and it must be presumed that the parties meant what they expressed." *Kermisch v. Savings Bank of Balto.*, 266 Md. 557, 559-60, 295 A. 2d 776 (1972). We cannot supply this additional term; and when, as here, the language of the contract is clear and unambiguous in specifying the conditions under which the agreement shall continue or terminate, all parties are bound by it. *Little v. First Federated Life*, 267 Md. 1, 296 A. 2d 372 (1972). Since we may not supply a condition for termination when the parties have expressly stated that it should continue as long as the "privilege and ability" to perform is retained, the only question left unresolved is that of the correct measure of damages.

At the time of appellant's breach, the appellee was receiving $3^1/4$¢ for each pack of cigarettes sold. As the parties stipulated that during the relevant time period 981,500 packs of cigarettes were sold at the Social Security Building, the appellee claims that it was damaged in the amount of $31,898.75 in lost profits. The chancellor concluded that the $3^1/4$¢ figure sought was too high as it did not reflect the appellee's overhead and he accordingly reduced it by $1/2$¢ per pack. In addition, he concluded that the sum received from the sale of the vending machines after the appellant's breach

was greater than the amount that would have been realized from their disposal at the time of lawful termination; therefore, he deducted $2,400 from the appellee's claim to reflect this difference. Based on this computation he awarded appellee $24,591.25 in damages. Neither side was happy with this sum. In addition to ARA's appeal, Evans has cross-appealed on the issue of damages, contending that the deduction of $1/2$¢ per pack, representing overhead expenses, was not justified. It argues that, since the inventory was delivered by the wholesaler (I. & L. Candy & Tobacco Co.) directly to the Social Security Building, other than nominal bookkeeping costs incurred in recording receipt of ARA's check and to pay for the inventory, there were no costs involved in conducting this phase of its operations. ARA, on the other hand, contends that not enough overhead expense was deducted by the court as Evans's overall cost of operation should have been considered. In addition, ARA argues that the amount awarded by the chancellor was excessive as Evans did not attempt to mitigate damages by putting the machines used in the Social Security Building to work elsewhere; that the cost of the new machines required under the second prime contract was not considered; that no recalculation of profit or loss resulting from the new system of commissions established by the second prime contract was made; and in any event Evans was not damaged in that its profits increased rather than decreased, following the breach in March 1966.

It is the generally accepted rule in this state that lost profits can be a fair measure of damages when they are shown to be the natural and probable consequence of the breach and the amount of loss is demonstrated with reasonable certainty. And, in determining lost profits, a calculation should be made as to the difference between what it would have cost Evans to perform and what it would have received had ARA not repudiated the contract. *Macke Co. v. Pizza of Gaithersburg*, 259 Md. 479, 270 A. 2d 645 (1970) and the cases cited therein. Judge Cardin concluded that profits were lost by Evans as a result of the breach and that the long history of its dealing with first Vendomat, then AFS, and finally ARA was sufficient evidence from which

its loss could be legally ascertained. Furthermore, although the second prime contract might have changed the per pack amount, its effect is not only speculative but also of no consequence, as the parties, regardless of the second prime contract, are bound by the existing agreed upon price. We therefore conclude that there was sufficient evidence to support the chancellor's finding that Evans would have received $3^{1}/_{4}$¢ per pack for its services during the applicable period. Likewise the deductions made by the chancellor as representing "what it would have cost Evans to perform" placed appellee's damages within the compass circumscribed by the testimony. In these circumstances we cannot say Judge Cardin's determinations were unreasonable or clearly in error. Rule 886.

In all, the appellant raises eight arguments on the issue of damages. Five of these have already been answered, either specifically or generally, by the conclusion we reached in our previous discussion on the issue of overhead as it related to appellee's lost profits. The remaining three contentions are subsidiary to its other arguments. ARA first contends that: under the terms of the second prime contract Evans would have had to purchase twenty-four new vending machines at a cost to it of "approximately" $10,440; Evans "would then have had to" sell these new machines twenty months later when the contract would have been terminated at Kaminsky's death; and since new products depreciate rapidly it is reasonable to "assume" that Evans "could not have" received more than the $4,800 it realized on the sale of the like number of old machines. Therefore, it claims a $5,640 loss would have been sustained and should have been deducted by the chancellor. The verb tenses used by appellant in and of themselves are indicative of the speculative nature of their argument. There was no evidence as to the rate of depreciation for vending machines or as to whether the new machines were to be of a similar type as the old ones previously sold. Therefore, we reject this claim for a reduction as being too speculative. Secondly, ARA states that Evans had a duty to put the machines that were sold to use elsewhere in an attempt to mitigate damages. Whether Evans could have mitigated its damages by using

elsewhere the machines obtained for the first prime contract or whether the loss incurred by such use might have been greater than that suffered by selling them, is again not the subject of any evidence and an answer would similarly be too speculative to form the basis for a reduction of the damages. The chancellor apparently concluded that Evans used sound business judgment in disposing of the machines and we can find no reason to disagree. Finally, appellant argues that after the breach Evans's overall net corporate profits increased substantially and this indicates that the Social Security operation was a losing venture. To state this contention is to refute it. But if more support is required we need only refer to the record which shows that the costs applicable to this project were so minimal that it is inconceivable that it could have been a losing proposition.

Accordingly we affirm the decree of the chancellor in all respects.

*Decree affirmed.*
*Costs to be paid by the appellant.*