THELMA DANZ, Personal Representative of the Estate of Jean Rita Winters v. CHARLES E. SCHAFER et ux.

[No. 1505, September Term, 1979.]

*Decided November 6, 1980.*

The cause was argued before Moylan and Wilner, JJ., and Irving H. Fisher, Associate Judge of the District Court of Maryland for District 5, specially assigned.

*Joseph L. Evans,* with whom was *Michael E. Marr* on the brief, for appellant.

*Timothy J. Martin* for appellees.

**52**

MOYLAN, J., 

The issue squarely before us on this appeal is the standard for reviewing a verdict rendered by a trial judge sitting without a jury on the basis of an agreed statement of facts. If it is standard A, we shall affirm; if it is standard B, we shall reverse. The issue could not be more cleanly joined.

The appellant, Thelma Danz, is the Personal Representative of the Estate of the late Jean Rita Winters. She sued the appellees, Nora P. Schafer and Charles E. Schafer, wife and husband, for approximately $8,000 allegedly owed by the Schafers to Mrs. Winters. Mrs. Winters had been Nora Schafer's aunt. The Schafers, defendants below, had defended on the theory that they had received the money from Mrs. Winters as a gift. The case came on for trial before Judge Edward A. DeWaters, Jr., in the Circuit Court for Baltimore County. No witnesses were called and counsel for both sides elected to proceed on an agreed statement of facts. That statement was as follows:

> "[O]n October 2nd, 1973, Jean Rita Winters established an account, savings account in the Baltimore County Savings and Loan Association, Incorporated, at Belair and Joppa Roads, Baltimore, Maryland 21236, which account was numbered 3336. The account was established in trust for the defendant, Nora Patricia Schafer, joint owners, subject to the order of either, balance at the death of either to belong to the survivor. I have a copy of that particular account. I have the passbook in question. I will offer, with no objection of counsel, a copy of the account. No objection.

> \* \* \*

> MR. MARR: Immediately after the account was opened, the passbook in question was surrendered and submitted to the defendant, Nora Patricia Schafer. Thereafter, of course, there were additional payments made into the account by the plaintiff,

Jean Rita Winters, or the then, the former plaintiff in this case, Jean Rita Winters, who, as the record should show, the aunt of the defendant, Nora Patricia Schafer. Thereafter, on September the 30th, 1974, Jean Rita Winters withdrew from the account seven thousand two hundred dollars, and gave those funds to the defendant, Nora Patricia Schafer. It should be noted, at this point, that the withdrawal was made with the execution of the signatures of both Jean Rita Winters and Nora Patricia Schafer. Thereafter, Jean Rita Winters asked that the funds in question be returned to the account, and the defendant, along with her husband, Charles E. Schafer, executed, on Thursday, July 3rd, 1975, an instrument which reads as follows:

"On September 30th, 1974, Mrs. Jean Winters withdrew from Baltimore County Savings and Loan Association, Incorporated, account number 3336, in the name of Jean Rita Winters, in trust for Nora Patricia Schafer, the sum of seventy-two hundred dollars, for the purpose of a personal loan to incorporate and pay loans in the name of Charles E. and Nora P. Schafer.

We do hereby promise to pay Mrs. Jean R. Winters the principal amount of seventy-two hundred dollars and interest at annual rate of six and one-quarter per cent on the balance due to account number 3336, in portions as soon as our finances enable us to do so.

In the event of our death, the estate is to pay to the account the full balance remaining of the said amount. Signed, Charles E. Schafer and Nora P. Schafer."

I would like to make this notarized copy, I might add, I would like to make that Exhibit 2."

\* \* \*

54

Before the execution of this document, and, in fact, the copy of the passbook, which your Honor has before you, reflects this: On June 10, 1975, the defendant placed one hundred dollars in the account; On June 27, 1975, an additional one hundred dollars into the account, and on the day that the instrument in question was executed by the defendant and her husband, she placed an additional eighty dollars into the account. Thereafter on August the 14th, 1975, an additional one thousand dollars was taken from the account by Jean Rita Winters, and given to Nora P. Schafer, the defendant herein. Subsequent to that time, Jean Rita Winters has made demand for the payment of the eighty-two hundred dollars plus interest, and we are submitting the matter to your Honor for a determination of the rights and liabilities of the parties herein. I might add that as Exhibit 3, I would like to present to the Court the check that was drawn on August 14th, 1975, from this account, and endorsed, and showing it was deposited to the account of Nora P. Schafer, the defendant herein. That will be Exhibit 3, and that would conclude the statement of facts."

Let it be noted that although in this case there is no dispute as to any of the first-level facts such as who said what to whom and where and when (and the credibility of witnesses has, therefore, no bearing on the decision), there yet remains a fact-finding issue to be resolved — the high-level fact finding of what to make of those first-level facts. From those arguably ambiguous first-level facts, the fact finder must come up with an ultimate, second-level fact. Does one infer from the undisputed physical phenomena and the undisputed conduct of the parties that Mrs. Winters made a gift of the money to her niece or does one infer that she made a loan? Even observing the same event, reasonable minds might read into it different significances. Judge

DeWaters, for his part, recognized that two contrary meanings could be drawn from the undisputed evidence:

"The primary issue before this Court is whether the transaction between the parties was in the nature of a loan and thereby created an indebtedness, or a valid *inter vivos* gift thereby extinguishing the Plaintiff's claim."

Judge DeWaters went on correctly to outline the essential elements for a valid *inter vivos* gift as spelled out by the Court of Appeals in *Rogers v. Rogers,* 271 Md. 603, 319 A.2d 119. Against that standard, he measured the undisputed facts in the instant case and the inferences (here is the critical area of dispute) that might fairly be drawn therefrom and rendered his ultimate opinion (a blend of the undisputed events and the disputed inferences) as follows:

"The facts stipulated to clearly reveal that there was a 'delivery of the subject of the gift ($7,200.00) that completely divested the donor of dominion and control' *Brooks v. Mitchell,* 163 Md. 1, 161 A. 261, 84 A.L.R. 547 (1932), and that there was an 'acceptance by the donee and an exercise of dominion and control over the subject of the gift', *Pomerantz v. Pomerantz,* 179 Md. 436, 19 A.2d 713 (1941). The court must now determine whether the facts as stipulated to evidence 'a clear and unmistakable intention on the part of the donor to make a gift' *Burleigh v. Miller,* 209 Md. 57, 120 A.2d 378 (1956), on September 30, 1974. In making its determination the court must weigh the facts and surrounding circumstances of the case. The facts indicate that: first, Mrs. Winters approached Mrs. Schafer and suggested that they make a withdrawal of Seven Thousand Two Hundred Dollars ($7,200.00) from their joint banking account; secondly, on September 30, 1974 the $7,200.00 was withdrawn under both Mrs. Winters' and Mrs. Schafer's signatures; thirdly, on that same

date the $7,200.00 was transferred from the dominion and control of both Mrs. Winters and Mrs. Schafer to the sole dominion and control of Mrs. Schafer with the written consent of Mrs. Winters, evidenced by her signature on the withdrawal slip. It is of fundamental importance to emphasize that at no time, during the delivery and acceptance of the $7,200.00 on September 30, 1974, did Mrs. Winters indicate that she expected any form of monetary reimbursement. It is this court's opinion that on September 30, 1974 there was a gratuitous delivery by Mrs. Winters of title and possession of $7,200.00, and there was an unequivocal acceptance by Mrs. Schafer of title and possession of $7,200.00. The facts and circumstances surrounding the case demonstrate a clear and unmistakable present intention on the part of Mrs. Winters to make a gift of the $7,200.00."

Following the critical day of September 30, 1974, there did, to be sure, occur some very significant actions on the part of the Schafers. They signed a promissory note indicating that ten months earlier the delivery to them of $7,200.00 had been a personal loan. They did, moreover, make several deposits into the joint bank account. These actions could, in the view of a particular observer, indicate that the original intention of Mrs. Winters even as of September 30, 1974 had been to make a loan. Some other observer, however, in his prerogative, might choose to view the gestures as calculated merely to placate a loved one — or, more cynically, perhaps, a potential Santa Claus or potential Daddy Warbucks — and thereby avoid the possible loss of possible future largess. For his part, Judge DeWaters gave little significance to the events post-September 30, 1974:

"It is important to understand that the later disagreement between the parties and the subsequent signing of a promissory note on July 8, 1975, cannot invalidate Mrs. Winters' clear intention to give the $7,200.00 to the Schafers ten

months prior. Concerning the additional One Thousand Dollars ($1,000.00) claimed due and payable by the Defendants to the Plaintiffs, the court refers to the factual stipulation wherein it is stated that on August 14, 1975 Mrs. Winters made a withdrawal of One Thousand Dollars ($1,000.00) and gave same to the Schafers. The wording of the stipulation clearly evidences: (1) an unequivocal intention by Mrs. Winters to give the $1,000.00 to the Schafers, (2) a delivery of the $1,000.00 by Mrs. Winters, and (3) an acceptance of the $1,000.00 by the Schafers."

From all of the above, he rendered his final judgment:

"Thus, the above stated facts are in compliance with the requisites and essential elements necessary to create a valid *inter vivos* gift. The September 30, 1974 transfer of $7,200.00 has been determined to be a gift, therefore, the issue before this court concerning the promissory note has become moot."

Shall we affirm or shall we reverse? It all depends upon the standard of review. Maryland Rule 1086, setting forth the appropriate standard of appellate review in a non-jury case, provides quite simply:

"When an action has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

If the clearly erroneous standard is the pertinent one in a case submitted to the court on an agreed statement of facts, we shall affirm. The facts that were agreed upon were sufficiently ambiguous to permit a reasonable mind to infer that there had been a perfected gift. By the same token, such an inference would be permitted but would not be compelled.

A reasonable mind might also decline to draw such inference. It is to resolve just such ambiguities that we have fact finders, be they judges or be they jurors. Either to infer a loan or to infer a gift would fall within the legitimate range of fact-finding prerogative. What we three appellate judges might infer from the same undisputed facts, were we the fact finders, is beside the point. To choose one resolution of the ambiguity from within a range of legitimate resolutions would not be an error on the part of the fact-finding trial judge, whether we would have made the same choice or not. If, then, this be the standard, we shall affirm the judgment of Judge DeWaters for the judgment rests upon a finding of fact that is not clearly erroneous. *Mulfinger v. Mulfinger,* 114 Md. 463, 79 A. 1089; *Milholland v. Whalen,* 89 Md. 212, 43 A. 43.

Initially disturbing, however, is the fact that both the appellant and, more remarkably, the appellee urge upon us a quite different standard of review. They both look to *Burleigh v. Miller,* 209 Md. 57, 120 A.2d 378, and extract from the language of that case a conclusion that we are not bound by the "clearly erroneous" standard in the present evidentiary posture but are at liberty to set aside the fact finding of the trial judge and to substitute our own fact finding. In *Burleigh v. Miller,* the Court of Appeals said at 209 Md. 68:

> "Of course, where the trial judge actually has the opportunity to see the witnesses and observe their manner of testifying, his finding of facts from their testimony is not set aside by this Court on appeal unless such finding was clearly erroneous. *This rule does not apply where he does not see or hear the witnesses. Schneider v. Menaquale,* 187 Md. 202, 204, 49 A.2d 330; *Donigan v. Donigan,* 208 Md. 511, 119 A.2d 430. Here, the trial judge had no greater opportunity to judge of their credibility than does this Court." (Emphasis supplied).

In his brief, the appellee cites *Burleigh v. Miller* and concludes, "this court is free to substitute its judgment on

the facts for that of the trial judge . . . but it must consider only those facts which were before the trial judge." At oral argument, both the appellant and appellee talked to this Court as if to a jury. They attempted to persuade us as if we were making our own *de novo* fact finding. They, furthermore, did this quite openly and candidly, urging such a fact finding responsibility upon us.

This Court has considered such an interesting, albeit unusual, possibility. We have put our heads together as fact finders and agreed that if we were looking *de novo* at the undisputed but ambiguous factual predicate here, we would give greater significance than did judge DeWaters to the events that occurred after September 30, 1974. On the basis largely of that hindsight, we would infer that the original intent of Mrs. Winters had been to make a loan. Let it be unmistakably clear, however, that this does not remotely suggest that we think Judge DeWaters was wrong, let alone clearly wrong.[1] It is no more the case that he is wrong and we are right than that we are wrong and he is right. The very nature of the fact-finding process is such that there is a range for divergent but equally legitimate conclusions, none of which are wrong. We cannot say, as a matter of law, that our finding of an intention to make a loan is compelled by clear and decisive evidence that permits no other conclusion. We simply aver that in a close case that could reasonably tilt either way, our personal and idiosyncratic tilt is in one direction. We would defend vigorously, however, the legitimate prerogative of others reasonably to tilt in a different direction. If we are at liberty, therefore, to undertake *de novo* fact finding, we should reverse.

As exotically beguiling as the proposition suggested by *Burleigh v. Miller* may be, however, it simply cannot be the

---

1. The irony that cannot escape the thoughtful observer is that appellate language about the clearly erroneous standard of review, for all of its ritual and repetitive incantation, is seldom put to the test of its principles. Most affirmances that intone their deference to the trial judge unless clearly wrong and which disclaim substituting their own findings for his, would have arrived at the same findings. Conversely, most reviewing courts that would arrive at different findings somehow conclude that the trial judge's findings were clearly wrong. Only when our subjective vision diverges from our objective vision is there a true test of objectivity.

state of the law. A reading of *Burleigh v. Miller* in full context strongly indicates that the evidence in that case was legally insufficient and that the decision of the trial judge was, as a matter of law, clearly erroneous. Under the circumstances, the descriptive language about the trial judge not having observed the witnesses and about the appellate court's equally good vantage point for viewing the evidence can be seen as an additional makeweight tossed in by the opinion writer to make the strongest possible case in support of the decision.

The point here raised remains a perplexing one, however, for such language from *Burleigh v. Miller* cannot be dismissed as a mere solitary aberration. That language from *Burleigh v. Miller* built, in its turn, upon equally suggestive language that had cropped up earlier in *Donigan v. Donigan,* 208 Md. 511, 521, 119 A.2d 430, and in *Schneider v. Menaquale,* 187 Md. 202, 204, 49 A.2d 330. In *Donigan v. Donigan,* the Court of Appeals modified an award of alimony and explained its justification for doing so in the following terms, at 208 Md. 521:

> "The award of alimony generally is a question of judgment on facts not in dispute and it is peculiarly the kind of determination which an appellate court feels freer to make than it does in matters which depend upon credibility, where the appearance and demeanor of the witnesses are important and the determination of disputed facts controls the case. Undoubtedly, this is the reason why this Court sometimes has changed the award of alimony, without expressly saying (as necessarily was implicit in the decision) that the chancellor was clearly wrong. In the case before us the chancellor did not see the witnesses and decided the case from the record, even as do we, without the benefit of oral argument which we have enjoyed, so that his opportunity for a sound exercise of judgment was not as great as ours."

In the last analysis, however, it is only the language of

*Donigan v. Donigan* that gives us pause and not its holding. After seeming to wander away verbally from the "clearly erroneous" standard, the Court returned to the faith in announcing its holding:

> "We think the chancellor was clearly wrong in refusing alimony."

The wellspring for the confusing ambivalence of *Burleigh v. Miller* is found all the way back in *Schneider v. Menaquale,* at 187 Md. 204:

> "As the chancellor, who decided the case, did not see and hear the witnesses, the rule that his finding will not be disturbed unless the evidence clearly demonstrates error, does not apply here. However, in every appeal to a court of superior jurisdiction, it is necessary for the appellant to point out that the trial court erred."

That, of course, is an absurdity. The reasoning contradicts itself without a pause for breath. The first sentence giveth; the second sentence taketh away. The first sentence tells us that the appellate court is free, in a case tried on a record, to substitute its judgment for that of the trial judge, even where he is not clearly wrong. The next sentence is equally absolute that such judgment will not be reversed unless the trial court has committed error. "We will not affirm the judge simply because he is free from error, but neither will we reverse him unless he has committed error." The only way the two diametric notions can be reconciled is to blend them into the arrogant conclusion that, even within a legitimate range of choices, to choose other than as the appellate court would choose is, *ipso facto,* error. The seeming deference is but illusion.

Such a conclusion, of course, would subvert the essential appellate mission of correcting trial error. It would transmute the reviewing function into a *de novo* viewing function whenever a dispute as to first-level facts should not be involved. *De novo* conclusion drawing rather than error finding would become the appellate role not simply where,

as here, a trial proceeded on an agreed statement of facts but also, by the same rationale, whenever first-level facts were not in dispute, whatever the mechanism for establishing such undisputed facts might be. This would be the situation, as in *Schneider v. Menaquale,* whenever one judge arrived at a verdict on a record made by a predecessor judge. This would be the situation whenever a chancellor arrived at a verdict on the basis of fact finding made by a master, auditor, examiner or referee. *Wenger v. Wenger,* 42 Md. App. 596, 402 A.2d 94. This would be the situation whenever basic physical facts produced by a stipulation as to testimony (or, for that matter, as produced by a live witness) were not in dispute, although dispute might yet remain as to the significance of those facts. This would be the situation, civilly or criminally, whenever circumstantial evidence was not disputed, although the outcome might yet pivot on what to deduce from that circumstantial predicate.

If such were the law, there would be no reason for the appellate court not to second guess the fact-finding judge (or, for that matter, the fact-finding jury) whenever the hinge of decision was whether to draw a permitted inference from an undisputed predicate fact. If it were agreed that a defendant had been, without explanation, in possession of a diamond ring that had been stolen two days earlier, a fact-finding trial judge would presumably be at liberty 1) to infer that the defendant was the thief, 2) to infer that the defendant was a receiver of stolen goods, or 3) to draw neither inference and set the defendant free (or rule that such person, as a state witness, needed no corroboration). *Brewer v. Mele,* 267 Md. 437, 449, 298 A.2d 156. Could it be argued that because his ability to view the witnesses had not been superior to our own, we should not forbear to second guess his choice? Such a proposition would follow logically from *Schneider v. Menaquale* and *Burleigh v. Miller.* Simply to think through its implications, however, is to recognize that the mischief would be boundless. It not only is not, but cannot, be the state of the law.

The taproot of analysis is that the deference paid by the appellate reviewing court to the fact finding and

evidence-based verdict rendering of a trial judge unless he is clearly erroneous,[2] is not predicated upon the fact that he alone saw the witnesses and observed their demeanor. That is a peripheral characteristic, not a cause. The deference is not even predicated upon the additional factor that the trial court "is not only the judge of a witness' credibility, but is also the judge of the weight to attach to the evidence." *Knowles v. Binford,* 268 Md. 2, 298 A.2d 862. The deference rather rests fundamentally upon the core difference between the trial function and the appellate function. One is to decide cases; the other is to screen out trial error.

The aberrational nature of the false eddy of *Schneider v. Menaquale* and *Burleigh v. Miller* becomes clear when we return to the mainstream of Court of Appeals analysis on the appropriate standard of review, the true course of which runs in quite the opposite direction. In *Sewell v. Sewell,* 218 Md. 63, 145 A.2d 422, Chief Judge Brune addressed the issue squarely, concluding at 218 Md. 71:

> "Where he has not seen and heard the witnesses, the concluding portion of Rule 886a of the Maryland Rules requiring that due allowance be made for the opportunity of the witnesses is not applicable, and the written testimony is as available to us as to the Chancellor; but the fact that he did not have the witnesses before him does not vitiate the first portion of that Rule which requires this Court to review a case tried by the court without a jury on both the law and the evidence, and prohibits setting aside the judgment of the lower court on the evidence unless clearly erroneous."

See also *Oliver v. Oliver,* 217 Md. 222, 229-230, 140 A.2d 908; *Chalkley v. Chalkley,* 236 Md. 329, 333, 203 A.2d 877; and *Bartell v. Bartell,* 278 Md. 12, 23, 357 A.2d 343.

---

2. Which makes his mistake one of law and not of fact, for to be clearly erroneous is to have reached a decision on the basis of facts that are not legally sufficient to support the decision. In this regard, see the scholarly and painstaking analysis of Judge Orth in *Williams and McClelland v. State,* 5 Md. App. 450, 247 A.2d 731.

Judge Smith came to grips with the same general issue, albeit in a slightly different factual posture, in *R.E.C. Management v. Bakst Serv.,* 265 Md. 238, 254, 289 A.2d 285:

> "The mandate of Maryland Rule 886 that when an action is heard by the trial court without a jury 'the judgment of the lower court will not be set aside on the evidence unless clearly erroneous' is applicable notwithstanding the fact that the judge did not have the opportunity to see and hear the witnesses."

See also *Dorf v. Skolnik,* 280 Md. 101, 117-118, 371 A.2d 1094. In the context of a child custody case, Judge Digges thoroughly analyzed Maryland Rule 886 (and, thereby, its counterpart, Maryland Rule 1086, applicable to this Court) and its predecessor provisions in *Davis v. Davis,* 280 Md. 119, 372 A.2d 231. He pointed out explicitly, at 280 Md. 123, "Nothing in Rule 886 indicates that it does not apply to *all* cases tried without a jury." (Emphasis in original.) He went on, at 280 Md. 124:

> "The words of the rule itself make plain that an appellate court cannot set aside factual findings unless they are clearly erroneous, and this is so even when the chancellor has not seen or heard the witnesses."

The current of analysis in this Court has consistently run parallel to that mainstream. In *Stefanowicz Corp. v. Harris,* 36 Md. App. 136, 373 A.2d 54, Judge Thompson applied the general principle even to the issue of extracting meaning from the words of a written contract, saying at 147, n.3:

> "3. We note that when construing the language of a written document, as opposed to oral testimony, where the trial judge has the most advantageous opportunity to judge the credibility of the witnesses, we are still bound by the clearly erroneous rule, even though the document can be interpreted by this Court as well as the trial judge."

The full measure of appellate deference was articulated by us even more recently in *Wenger v. Wenger, supra,* where we said, at 42 Md. App. 602:

"A given set of facts does not lead mechanically to a single, automatic disposition but may support a range of discretionary dispositions. When an appellate court, absent clear error, defers to a trial court, it defers not only to the fact-finding but to any legitimate verdict, disposition or judgment emanating from that fact-finding."

And so, we affirm the judgment of Judge DeWaters in this case because we hold that his findings of ultimate fact from out of the agreed statement of facts were not clearly erroneous, Maryland Rule 1086, even though we, had we been he, would have found otherwise. His verdict based upon those findings, therefore, was not wrong as a matter of law.

*Judgment affirmed; costs to be paid by appellant*